UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KURTIS MONSCHKE,<br><br>               Petitioner,<br><br>   v.<br><br>JAMES N. CROSS and BERNIE<br>WARNER,<br><br>               Respondents. | No. 11-5276 RBL/KLS<br><br>**REPORT AND RECOMMENDATION**<br>**Noted for:  June 29, 2012** |

Petitioner Kurtis Monschke filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2004 conviction for aggravated first degree murder and raising nine grounds for federal habeas relief.  ECF No. 1.  Respondents filed an Answer and submitted relevant portions of the state court record.  ECF Nos. 25 and 26.  Having carefully considered the parties' filings and relevant record, the undersigned recommends that the petition be denied and this action dismissed with prejudice.

## BACKGROUND

Mr. Monschke was convicted by jury verdict of one count of aggravated first degree murder.  On June 4, 2004, Pierce County Superior Court Judge Lisa R. Worswick sentenced him to life imprisonment without the possibility of parole.  ECF No. 46, Exh. 18.  Mr. Monschke is currently incarcerated by the United States Bureau of Prisons pursuant to an agreement between the state Department of Corrections (DOC) and the federal government.

REPORT AND RECOMMENDATION - 1

## A. Factual Background

### 1. Facts of Crime

The Washington Court of Appeals summarized the facts of Mr. Monschke's crime as follows:

> Early on the morning of March 23, 2003, Terry Hawkins and Cindy Pitman observed a group of "[s]kinheads" kicking and using baseball bats to hit what appeared to be the Tacoma railroad track. 22 Report of Proceedings (RP) at 1078. The individuals were hollering and appeared drunk. Hawkins and Pitman were homeless and lived in a camp under Interstate 705 near the train tracks and the Tacoma Dome. Hawkins told police that he saw three men and a woman kicking dirt and hitting at the ground; at trial, he testified that he saw two men swinging bats, a woman kicking, and a third man standing four feet away. Pitman told police and later testified that she saw three men with shaved heads swinging and kicking but did not see a woman.
>
> Hawkins and Pitman watched for approximately 10 minutes before turning around and walking away. They headed up a trail but when the commotion stopped, they decided to go back toward the train tracks and their camp. On their way to the camp site, Hawkins and Pitman passed the people involved in the commotion: a man and woman snuggled together with two men following behind. The four headed up the trail and appeared "scared," like "[t]hey were trying to get away from there." 23 RP at 1218.
>
> As Hawkins and Pitman approached the tracks where the commotion had been, they heard a strange gurgling sound. They discovered the badly beaten and bloody body of Randy Townsend, lying on his back with his head slumped over the train track. Hawkins and Pitman knew Townsend as a white acquaintance who camped nearby, but Townsend was so disfigured that neither Hawkins nor Pitman immediately recognized him. Hawkins and Pitman ran to get aid and call the police. As they returned to Townsend, Hawkins and Pitman saw the four individuals involved in Townsend's assault driving away in a "blue Datsan [sic] beater." 27 RP at 1769.
>
> Townsend never regained consciousness and died after 20 days on life support. The medical examiner determined the cause of death as blunt force trauma to the head, with at least 19 points of impact. Townsend's facial bones were broken and his face had separated from his skull. One of the blows caused a large subdural hematoma on the back side of his skull. This wound was consistent with his head having been forcefully stomped on while he was lying face down on the train track.

REPORT AND RECOMMENDATION - 2

During the investigation that followed, officers found hate-based graffiti near the murder scene. The graffiti included swastikas, lightning bolts in the shape of "SS," "White Power Skinheads," "U Suck Wiggers," "El Spic," "Skinhead white to the bone," "Die SHARPS," "Die Junky Die," "El Nigger," "Tacoma Skinhead Movement," "die niggers," "Heil Hitler," and "Fuck All Drug Addicts."[2] 21 RP at 940; 26 RP at 112, 116, 118–19, 121–22. Homeless people in the area told police that the graffiti began appearing a couple weeks before Townsend's murder.

Officers also talked to Mertis Mathes and Amy Gingrich, a homeless couple living in a camp two blocks from the murder scene. Mathes is black and Gingrich is white. Mathes and Gingrich told officers they woke early on the night of the murder when three loud men approached their camp. Gingrich recognized one of the men from a casual encounter a couple weeks earlier. The men had shaved heads, appeared drunk, and were carrying baseball bats. Mathes asked what the men wanted. One responded, "we plan on doing a nigger like you." 21 RP at 956. When Mathes grabbed his machete, the three men walked away.

Officers linked the crime scene graffiti to a reported incident of graffiti at an apartment building two blocks from the murder scene. Scotty Butters, Tristain Frye, and David Pillatos had been evicted from the Rich Haven Apartments for yelling racial slurs at passersby, painting swastikas and "Fuck all niggers" on the building, and for Butters's sale of imitation cocaine to a drug addict. 26 RP at 147. Butters, Frye, and Pillatos matched Hawkins and Pitman's descriptions of Townsend's assailants.

Frye and Pillatos lived with Monschke. Frye and Pillatos were in a relationship and Frye was three months' pregnant. A car matching the one Hawkins and Pitman described was parked outside Monschke's apartment. Officers went to the apartment to discuss an unrelated incident with Pillatos, and he invited them inside. In Monschke's apartment, officers saw Nazi and white supremacist paraphernalia. They also noticed cigarette packages and empty beer bottles of the same brand found at the crime scene. Pillatos freely told the officers that he and Monschke were white supremacists.

[2] A pair of lightning bolts in the shape of "SS" is a neo-Nazi symbol. "Wigger" is a disparaging term used to describe white individuals who associate with minorities. "SHARPS" is an acronym for the white supremacist group Skinheads Against Racial Prejudice. "Spic" is a disparaging term used to describe a person of Latin American descent. [Court's footnote 2.]

ECF No. 25, Exh. 23, at 1-4; *State v. Monschke*, 133 Wn. App. 313, 319-21, 135 P.3d 966 (2006).

REPORT AND RECOMMENDATION - 3

## 2.    Trial Testimony

The Washington Court of Appeals summarized the testimony presented at trial:

Frye testified at trial that on the evening of March 22, 2003, Pillatos brought up the subject of taking Frye out to earn her "red [shoe]laces." 30 RP at 2330. According to Frye, red shoelaces symbolized that the wearer had assaulted a member of a minority group; Butters, Monschke, and Pillatos each wore red shoelaces. Pillatos encouraged Butters and Monschke to take Frye out; the three men had discussed the idea two or three times before. After the discussion, the four drove to a grocery store to buy beer. The three men also purchased two baseball bats. They did not discuss the reason for the bats, but, according to Frye, it was understood that "they weren't going to be used for baseball." 31 RP at 2485.

The four then drove to the Tacoma Dome. Butters expressed a desire to go to a different part of the city to "beat up some niggers," but Frye and Pillatos wanted to show Monschke graffiti they had recently painted nearby. 30 RP at 2333. As they walked underneath Interstate 705, Frye separated from the group. She sat down and Townsend approached her. Townsend asked for a cigarette and a beer and the two talked for awhile.

Townsend finished his cigarette and had begun to walk away when Butters and Pillatos confronted him. Butters said something to Townsend and then struck him in the head with the bat. The blow shattered the bat and sent Townsend to the ground. Butters and Pillatos then began kicking Townsend in the head. Pillatos picked up a large rock, later determined to weigh 38 pounds, and threw it on Townsend's face. Butters and Pillatos carried Townsend to the train tracks and placed him on his stomach with his head lying face down on the track. Butters then stomped on the back of Townsend's head. Although Townsend was still breathing, Butters exclaimed, "I killed that guy." 30 RP at 2346. Butters and Pillatos went to find Monschke.

Monschke was carrying the second bat when the three men returned to where Townsend lay. Monschke walked up to Townsend and began hitting him in the head with the bat. Monschke struck 10 to 15 blows while Butters continued to kick Townsend's head. Butters repeatedly called Townsend "a piece of shit." 30 RP at 2349. Pillatos told Frye to kick Townsend. According to Frye, she initially refused, but Pillatos covered her eyes and led her to Townsend. Frye then kicked Townsend's head four times. As the group left, Monschke stated, "I wonder if God gives us little brownie points for this." 31 RP at 2369.

When the four returned to Monschke's apartment, Monschke and Pillatos gathered up the clothing worn during the attack and left to burn it. Later, Butters told Frye, "Don't feel sorry for that piece of shit. He wasn't white." 31 RP at

2374. Butters excitedly told Frye that she had earned her red laces and he had earned his "bolts." 31 RP at 2375. At trial, the State presented evidence that between the time of his arrest and his testimony at trial, Butters had obtained an "SS" lightning bolt tattoo. *See* note 1, *supra*.

Butters, Pillatos, and Monschke also testified; their testimony differed from each other's and from Frye's in certain respects. Pillatos testified that Monschke hit Townsend in the head with the bat three or four times. Monschke and Butters testified that Monschke was somewhere else during the entire assault and that he used the bat afterwards simply to nudge Townsend to see if he was still alive. Butters also testified that he told officers that Monschke hit Townsend 10 or more times.

Although all three men denied that Townsend's death was premeditated or that it had anything to do with earning red shoelaces, Butters and Pillatos offered contradictory testimony. Like Frye, Butters testified that on the night of the murder, there was a discussion about Frye earning her red shoelaces. According to Butters, red shoelaces reflected that one was willing to shed blood, not necessarily that one had done so; Butters had earned his red shoelaces on more than one occasion by doing something physical. Butters testified that after the attack, Frye said, "This means my baby gets to wear red laces, too." 30 RP at 2293. In addition, Pillatos testified that Townsend "got beat up" because he was a drug addict and a "parasite." 29 RP at 2106.

Jennifer Stiffler, who dated Monschke from September 2002 to March 2003, testified that Monschke was a very active white supremacist: He was a member of Volksfront and often talked about moving up in the group and starting a Tacoma chapter; he took Stiffler to a meeting for National Alliance; he decorated his home with white supremacist and Nazi memorabilia, including a flag for National Alliance; he listened to racist music; he frequently passed out fliers from several groups; and he obtained Nazi and white supremacist tattoos. According to Stiffler, Monschke and Pillatos repeatedly watched the movie AMERICAN HISTORY X (New Line Productions 1998), which includes a "curb stomp" scene that Monschke particularly enjoyed. In that scene, the main character, a white supremacist, shoots a black man and then stomps on the back of his head while the man is forced to bite a street curb.

Stiffler further testified that Monschke would wear white or red suspenders and red shoelaces whenever he went out with friends. Monschke told Stiffler that white suspenders symbolized "white pride" and that red shoelaces and suspenders "means you've beaten up somebody." 32 RP at 2602. Stiffler testified that she overheard Monschke several times talking to Frye about earning her red shoelaces. Stiffler also testified that Monschke had told her that he hated drug addicts.

The State presented evidence of white supremacist paraphernalia police found during their investigation. The items found in Monschke's apartment included: a National Alliance flier; pamphlets entitled "Martin Luther King Jr. was a fraud," "What is Holocaust Denial," and "Inside the Auschwitz Gas Chambers";[3] and a business card listing a website and reading "Sick of wiggers? So are we. Check us out."[4] The items found in a storage unit Pillatos rented included: applications filled out by Pillatos and Frye to join the Aryan Nations; photos showing that Monschke had tattoos identical to the main character in AMERICAN HISTORY X; and a photo of Monschke giving a Nazi salute.

The State also presented evidence of white supremacist paraphernalia found in Brian Zauber's home. At the time of his arrest, Monschke was living with Zauber,[5] the local leader for National Alliance. Officers saw a hanging flag matching one that had been seen in Monschke's apartment. They also found the following items: THE TURNERS DIARIES [sic],[6] a book commonly referred to as "the bible for the white supremacist movement";[7] a National Alliance membership card and an order form for National Alliance books and pamphlets; a "White Aryan Resistance" newspaper;[8] and an envelope with the names "Randall Townsend" and "Kurtis Monschke" written on it.[9]

Officers found the following in a bag belonging to Monschke: a National Alliance handbook and membership list; a photo album of white supremacist activities; and a flag with "SS" shaped lightning bolts. *See* note 1 [sic], *supra*. The State and Monschke each presented expert testimony on the subject of white supremacy. The State called Mark Pitcavage, the director of fact-finding for the Anti–Defamation League (ADL). Pitcavage had studied white supremacy for several years and supervised the ADL's monitoring and research of extremist groups. Pitcavage testified that white supremacists could be identified by a shared ideology summed up in the following mission statement known as "The 14 Words": "We must secure the existence of our race and a future for white children." 25 RP at 1598. Pitcavage opined that this ideology fostered so many shared similarities, beliefs, and customs that white supremacists could be considered a "group" within the common meaning of the term.

Pitcavage considered white supremacists to be a "group" even though they were not well organized, did not have one overarching structure, had many subgroups, and were split over the advocacy and use of violence. Pitcavage explained that the subgroups were nonexclusive; routinely overlapping; and often loosely organized to prevent police infiltration, to limit legal liability, and to maintain a certain level of personal anonymity. Pitcavage testified to an organized "hierarchal structure" "in terms of status, where someone who's perceived to be really standing up for the white race, really being a white warrior, gets more results of status, gets more respect." 25 RP at 1635. In addition, Pitcavage testified that many subgroups internally advocated violence but

publicly professed nonviolence so as to avoid lawsuits of the sort that had disbanded earlier white supremacy groups.

Monschke called Randy Blazak, a college professor whose research focused on hate crimes. Blazak opined that white supremacists were not an "identifiable group." Blazak agreed with Pitcavage that white supremacists shared an ideology captured by "The 14 Words," but he testified that in his opinion there was too much conflict within the movement to consider white supremacists a cohesive group. These conflicts included disagreement over the need of an organized hierarchy, the use of violence, the role of religion, and defining who was "white."

Blazak also testified about Volksfront and National Alliance. According to Blazak, National Alliance was a highly violent subgroup of white supremacists. Blazak testified that a member could gain status in National Alliance for murdering someone deemed inferior. Blazak described Volksfront as a very secretive organization with a "public front" of nonviolence, but he noted that "there may be other things that go on behind closed doors." 34 RP at 2911. Blazak also testified that Volksfront had an organizational hierarchy. According to Blazak, Volksfront and National Alliance had over the last several years been partnering and connecting.

The State presented evidence that Volksfront maintained a prisoners-of-war (POW) list on its website. The list included the contact information for members of the white supremacy movement that had committed hate crimes and were currently incarcerated. Several individuals on the list had committed "very violent" crimes. 33 RP at 2696. The State also presented evidence that Monschke left messages on Volksfront's website and that he went by the screen name "SHARPshooter." 33 RP at 2686. See note 1 [sic], supra.

[3] 27 RP at 1789. [Court's footnote.]
[4] 27 RP at 1793-94; see note 1, supra. [Court's footnote.]
[5] Monschke was evicted from his apartment in the period between the attack and his arrest. [Court's footnote.]
[6] ANDREW MACDONALD, THE TURNERS DIARIES [sic] (2d ed.1996). [Court's footnote.]
[7] 28 RP at 1920. [Court's footnote.]
[8] 28 RP at 1923. [Court's footnote.]
[9] 28 RP at 1922. [Court's footnote.]

ECF No. 25, Exh. 23, at 6-11, *State v. Monschke,* 133 Wn.App. at 323-38.

REPORT AND RECOMMENDATION - 7

**B.      State Procedural History**

  **1.      Direct Appeal**

  The jury convicted Mr. Monschke of aggravated first degree murder and he appealed to the Washington Court of Appeals.  Appellate counsel filed a brief raising numerous claims, including challenges to the constitutionality of RCW 10.95.020(6) (which defines first-degree murder as aggravated first-degree murder if the defendant "committed the murder to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group"), evidentiary rulings, and the court's decision to require Mr. Monschke to wear a stun belt throughout the trial.  ECF No. 26, Exh. 19.  Mr. Monschke filed a pro se statement of additional grounds for review.  *Id.*, Exh. 20.  On June 6, 2006, the Court of Appeals issued an opinion published in part, affirming the conviction.  *Id.*, Exh. 23, *State v. Monschke*, *supra*.

  Mr. Monschke sought discretionary review by the Washington Supreme Court.  ECF No. 26, Exh. 24, at 5-20.  On March 6, 2007, the Washington Supreme Court denied review without comment.  *Id.*, Exh. 25.  The Washington Court of Appeals issued its mandate on March 13, 2007.  *Id.*, Exh. 26.  The United States Supreme Court denied Mr. Monschke's petition for certiorari on October 1, 2007.  *Monschke v. Washington*, 552 U.S. 841 (2007).

  **2.      Personal Restraint Petition (2008-2011)**

  On September 30, 2008, Mr. Monschke filed a pro se personal restraint petition with the Washington Court of Appeals.  ECF No. 26, Exh. 27.  Counsel was later appointed for him, *see* Exhibit 29, and counsel filed a brief in support of the petition.  *Id.*, Exh. 30.  The petition presented the Court of Appeals with two claims: (1) defense counsel provided ineffective assistance at trial by calling Dr. Blazak as a defense witness without conducting an adequate

investigation of what he would say on cross-examination; and (2) the prosecutors committed misconduct by calling witnesses (Pillatos and Frye) who concocted a false story to obtain Frye's early release and by reaching a favorable plea agreement with Frye based on the elected prosecutor's personal friendship with Frye's defense counsel. *Id.*, Exh. 27 (petition), at 15-19; Exh. 30 (counsel's opening brief), at 5-43. Both Mr. Monschke and the State supplemented their submissions to the court with numerous affidavits, declarations, and other documents. *See id.,* Exhs. 27, 28A, and 30.

The Court of Appeals rejected Mr. Monschke's claims and dismissed the petition in a published opinion. ECF No. 26, Exh. 31; *In re Monschke*, 160 Wn. App. 479, 251 P.3d 884 (2010). The Court of Appeals ruled that Mr. Monschke failed to prove counsel's performance with respect to Dr. Blazak's testimony was deficient and there was no prejudice to Mr. Monschke's right to a fair trial. *Id.*, Exh. 31, at 12-16. The court also held the State had a legitimate purpose in reaching a plea agreement with Frye and there was nothing improper in the plea agreement. *Id.* at 16-18. The court further concluded that Mr. Monschke failed to prove any of the testimony was perjured. *Id.* at 18-20.

Mr. Monschke sought discretionary review by the Washington Supreme Court. Counsel's motion for discretionary review presented the Supreme Court with two grounds for review: (1) counsel provided ineffective assistance by calling Dr. Blazak as a defense witness without conducting an adequate investigation of what he would say on cross-examination; and (2) the prosecutors committed misconduct by calling Pillatos and Frye as State's witnesses, and by offering Frye a favorable plea agreement, despite the witnesses' efforts to present perjured

testimony.  ECF No. 26, Exh. 34.[1]  The motion was not filed, however, until April 6, 2011.  The clerk directed counsel to file a motion for extension of time to file a motion for discretionary review.  *Id.*, Exh. 36.  Counsel filed the motion and the court granted it.  *Id.*, Exh. 37.

On July 11, 2011, the Commissioner of the Supreme Court denied discretionary review.  ECF No. 26, Exh. 39.  The Commissioner concluded that defense counsel's performance was not deficient and that Mr. Monschke had failed to establish prejudice.  *Id*. at 2.  The Commissioner agreed with the Court of Appeals that the State did not knowingly present perjured testimony and that Mr. Monschke failed to prove that Frye perjured herself.  *Id*. at 3.  Mr. Monschke's motion to modify the Commissioner's ruling was denied.  *Id.*, Exhs. 40, 41.

## ISSUES FOR FEDERAL REVIEW

Mr. Monschke raises nine grounds for federal habeas relief, summarized as follows:

1.  The statutory aggravating factor under RCW 10.95.020(6) that the defendant "committed the murder to obtain or maintain his or her membership in the hierarchy of an organization, association, or identifiable group" is vague and overbroad, in violation of the First and Fourteenth Amendments.

2.  The statutory aggravating factor under RCW 10.95.020(6), as interpreted by the Washington courts, unconstitutionally punishes defendants for engaging in First Amendment-protected activity.

3.  The trial court's limiting instruction concerning the jury's consideration of the white supremacist literature and materials seized at Monschke's residence allowed the jury to consider First Amendment-protected conduct as evidence of guilt.

4.  Petitioner was denied the Sixth Amendment right to confront and cross-examine David Pillatos, Dr. Mark Pitcavage, and Detective Shipp.

---

[1] The State also filed a motion for discretionary review.  The State's motion challenged the Court of Appeals' holding that personal restraint petitioners who raise ineffective assistance of counsel claims need not satisfy a heightened standard of showing "actual prejudice" in order to obtain relief on collateral review.  *See* ECF No. 26, Exh. 35.  The Commissioner of the Washington Supreme Court denied the State's motion in a separate order issued on September 30, 2011.  *Id.*, Exh. 42.

REPORT AND RECOMMENDATION - 10

5.      Petitioner was denied the Sixth Amendment right to compulsory process by the exclusion of expert testimony of Randy Blazak regarding the phenomenon of white gangs in juvenile detention facilities.

6.      The prosecutor committed misconduct by falsely impugning the integrity of defense counsel and suggesting defense counsel had tampered with a State's witness, in violation of the Sixth Amendment.

7.      The trial court's "to-convict" instruction (Instruction No. 12) relieved the State of its burden of proving each element of the crime beyond a reasonable doubt.

8.      Defense counsel provided ineffective assistance by failing to properly investigate and prepare Dr. Randy Blazak, a defense expert whose testimony was damaging to the defense theory.

9.      The prosecutor committed misconduct by presenting false testimony and by offering a co-defendant a favorable plea bargain based on the personal friendship between the elected prosecutor and the co-defendant's attorney.

ECF No. 1, at 5-8; 24-40.

## EXHAUSTION OF STATE REMEDIES

Respondent concedes that Mr. Monschke has exhausted his available state remedies. *See* ECF No. 25, at 11.

## EVIDENTIARY HEARING

A petitioner who fails to develop the factual basis of a claim in state court is not entitled to an evidentiary hearing unless the claim relies on:

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense. . . .

REPORT AND RECOMMENDATION - 11

28 U.S.C. § 2254(e)(2).

"[T]he statute applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.'" *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 1487. "[A] failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id*. at 1488. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend ... upon whether those efforts could have been successful." *Id*. at 435; *Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999).

Even if 28 U.S.C. § 2254(e)(2) does not bar an evidentiary hearing, the decision to hold a hearing is still committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465,127 S. Ct. 1933, 1939-41 (2007). A hearing is not required if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d). *Id*. at 1939-40. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 127 S. Ct. at 1940. "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id*. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, ---U.S.---, 131 S. Ct. 1388 (2011). The statute bars consideration of evidence presented for the first time in federal court. *Id*.

Mr. Monschke's habeas claims present legal questions only and therefore, they may be resolved by review of the state court record. Moreover, his claims were adjudicated on the merits by the state courts for purposes of 28 U.S.C. § 2254(d). The state court decisions in Mr. Monschke's case contain findings of fact that are entitled to deference under 28 U.S.C. § 2254(d)(2) and the presumption of correctness under 28 U.S.C. § 2254(e)(1). Habeas review in this case is limited to the record that was before the state courts. *Cullen v. Pinholster, supra*. The undersigned concludes that this Court need not conduct an evidentiary hearing.

## STANDARD OF REVIEW

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 112 S. Ct. 475 (1991); *Lewis v. Jeffers,* 497 U.S. 764, 110 S. Ct. 3092 (1990); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S. Ct. 871 (1984).

A federal court cannot grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). State court decisions must be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357 (2002).

A state court decision is "contrary to" the Supreme Court's "clearly established precedent if the state court applies a rule that contradicts the governing law set forth" in the Supreme

Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and "nevertheless arrives at a result different from that precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73, 123 S.Ct. 1166 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495 (2000)). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75. That is, "[t]he state court's application of clearly established law must be objectively unreasonable." *Id.*

Under 28 U.S.C. § 2254(d)(2), a federal petition for writ of *habeas corpus* also may be granted "if a material factual finding of the state court reflects 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Juan H. v. Allen*, 408 F.3d 1262, 1270 n.8 (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)). However, "[a] determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## DISCUSSION

**A.    Claim 1 – Constitutionality of RCW 10.95.020(6)**

In his first ground for federal habeas relief, Mr. Monschke argues that RCW 10.94.020(6) is unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments to the Constitution. ECF No. 1, at 5; ECF No. 30, at 10-15. RCW 10.95.020(6) provides that a first-degree murder is an aggravated first-degree murder if the defendant "committed the murder to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." RCW 10.95.020(6).

REPORT AND RECOMMENDATION - 14

### 1)  Overbreadth of RCW 10.95.020(6)

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech."  The First Amendment protects an individual's right to express unpopular views and to associate with others who share the same viewpoint.  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).  "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002).

Under the First Amendment's overbreadth doctrine, a statute may be invalidated as overbroad for its chilling effect on free speech only if a "substantial" number of its applications would result in prohibiting constitutionally protected speech.  *United States v. Williams*, 553 U.S. 285, 292, 128 S.Ct. 1830 (2008); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n. 6, 128 S.Ct. 1184 (2008).  "[W]e have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in the absolute sense, but also relative to the statute's plainly legitimate sweep. … Invalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'"  *Williams*, 553 U.S. at 292-93 (emphasis in original) (citations omitted).  The first step in a court's overbreadth analysis is "to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  *Williams*, 553 U.S. at 293.  A state court's construction of a state statute, including the state court's definition of statutory terms or any narrowing interpretation it has given the statute, is binding on a federal court.  *Wisconsin v. Mitchell*, 508 U.S. 476, 483, 113 S.Ct. 2194 (1993); *R.A.V. v. St. Paul*, 505 U.S. 377, 381, 112 S.Ct. 2538 (1992).

REPORT AND RECOMMENDATION - 15

In *Wisconsin v. Mitchell*, the defendant was convicted of aggravated battery and received an enhanced sentence under Wisconsin law based on evidence he intentionally selected his victim on account of the victim's race. *Mitchell*, 508 U.S. at 480-81. The defendant challenged the penalty-enhancement statute on overbreadth grounds, arguing it had a "chilling effect" on his free speech because evidence of his prior speech or associations could be used to prove he had a racial motive to commit the crime. *Id.* at 488. The Supreme Court unanimously rejected this overbreadth claim:

> The sort of chill envisioned here is far more attenuated and unlikely than that contemplated in traditional "overbreadth" cases. We must conjure up a vision of a Wisconsin citizen suppressing his unpopular bigoted opinions for fear that if he later commits an offense covered by the statute, these opinions will be offered at trial to establish that he selected his victim on account of the victim's protected status, thus qualifying him for penalty enhancement . . . . We are left, then, with the prospect of a citizen suppressing his bigoted beliefs for fear that evidence of such beliefs will be introduced against him at trial if he commits a more serious offense against person or property. This is simply too speculative a hypothesis to support Mitchell's overbreadth claim.

> The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.

*Mitchell*, 508 U.S. at 488-89.

The Washington Court of Appeals turned to the above cited language in *Johnson,* 491 U.S. at 414, and *Mitchell,* 508 U.S. at 488-89, when it rejected Mr. Monschke's claim that he was convicted and punished for expressing unpopular, racist opinions and associating with others who held similar opinions:

> RCW 10.95.020(6) is far less "intrusive" than the statute upheld in *Mitchell.* It is content neutral and does not intrude on constitutionally protected rights. RCW 10.95.020(6) merely requires an enhanced punishment for committing murder if the murder was committed to obtain, maintain, or advance

REPORT AND RECOMMENDATION - 16

one's position in the hierarchy of an organization, association, or identifiable group. That a political or other viewpoint was expressed through the particular murder or that the murder furthered the exercise of the murderer's association rights does not alter or shield the criminal act: "The First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 102 S. Ct. 3409, 73 L.Ed.2d 1215 (1982). "[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection." *Roberts v. U.S Jaycees*, 468 U.S. 609, 628, 104 S. Ct. 3244, 82 L.Ed.2d 462 (1984). Accordingly, we reject Monschke's claim that RCW 10.95.020(6) is unconstitutionally overbroad in that it limits his First Amendment rights.

ECF No. 26, Exh. 23, at 15.

Mr. Monschke was not convicted for espousing unpopular beliefs or for his association with racist organizations. He was convicted under RCW 9A.32.030(1)(a) for committing the premeditated murder of Randall Townsend. As explained by the Washington Court of Appeals, RCW 10.95.020(6) is a sentence enhancement applied in cases in which the defendant committed a premeditated murder in order "to maintain his or her membership or to advance his or her position in the hierarchy or an organization, association, or identifiable group." The enhancement does not increase the defendant's punishment for mere speech or membership in a group. Conversely, the fact that a political or other viewpoint was expressed through the particular murder or that the murder furthered the murderer's association rights does not alter or shield the criminal act. Moreover, the statute is content neutral. It applies regardless of the philosophy or goals of any particular organization, association, or identifiable group.

The Washington Court of Appeals also concluded that there is nothing in RCW 10.95.020(6) to chill the First Amendment right of individuals for espousing white supremacist views or for associating with white supremacist groups. This Court agrees that it is simply too much of a stretch to believe that a person will forgo joining a group out of concern that if he

REPORT AND RECOMMENDATION - 17

later commits a premeditated murder, his membership in that group will be offered as evidence under RCW 10.95.020(6).

The Washington Court of Appeals' rejection of Mr. Monschke's overbreadth argument is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent governing such claims. Thus, Mr. Monschke's claim that RCW 10.95.020(6) is unconstitutionally overbroad should be denied.

### 2. Unconstitutional Vagueness of RCW 10.95.020(6)

A fundamental principle underlying due process is that a criminal statute must give a person of ordinary intelligence fair warning that his contemplated conduct is forbidden; "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S.Ct. 1697 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808 (1954)). A criminal statute must clearly define the conduct it proscribes. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294 (1972). The void-for-vagueness doctrine governing due process challenges requires that a penal statute provide fair warning by defining the criminal offense (1) with sufficient definiteness that ordinary people can understand what is prohibited, and (2) in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855 (1983). A conviction will fail this void-for-vagueness test if the underlying criminal statute does not provide fair notice of what is prohibited, or if it is so standard-less that it authorizes or encourages seriously discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480 (2000).

"[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute," *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219 (1997), but due

process places limits on judicial clarification of penal statutes. Although the Ex Post Facto Clause does not directly apply to the judicial branch of government, similar rules against *ex post facto* judicial decision-making are inherent in the notion of due process. *Rogers v. Tennessee*, 532 U.S. 451, 456, 121 S.Ct. 1693 (2001) (citing U.S. Const. Art. I, § 10, cl. 1). "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law." *Bouie*, 378 U.S. at 353. Accordingly, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. at 266. A judicial construction of a penal statute violates the principle of fair warning "only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Rogers*, 532 U.S. at 462 (quoting *Bouie*, 378 U.S. at 462).

The touchstone of the due process analysis is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. The same standard applies even in the First Amendment context: "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781,794, 109 S.Ct. 2746 (1989)). In cases involving challenges to a state-court conviction, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602 (2005).

The Washington Court of Appeals rejected Mr. Monschke's challenge alleging that RCW 10.95.020(6) was unconstitutionally vague:

REPORT AND RECOMMENDATION - 19

The legislature did not define "group," "identifiable," or "hierarchy," but these terms are commonly understood and are not ambiguous. A "group" is "a number of individuals bound together by a community of interest, purpose, or function," or a "number of persons associated formally or informally for a common end or drawn together through an affinity of views or interests." WEBSTERS THIRD NEW INT'L DICTIONARY 1004 (3d ed. 1976); *see also id*. at 1123 (defining "ideology" as "a manner or the content of thinking characteristic of an individual, group, or culture"). A group is "identifiable" if it is "subject to identification" or "capable of being identified." WEBSTERS THIRD NEW INT'L DICTIONARY 1004 (3d ed.1976). A "hierarchy" is "the classification of a group of people with regard to ability or economic or social standing." WEBSTERS THIRD NEW INT'L DICTIONARY 1066 (3d ed.1976).

When considered together, these definitions express the legislature's determination that a person's legal culpability for murder is greater if the murder is committed to advance the murderer's standing amongst a number of persons subject to identification and bound together, whether formally or informally, by a shared ideology or affinity of views. The range of groups falling within RCW 10.95.020(6) is nearly infinite and can include such entities as a cheerleading squad, a law firm, the Republican or Democratic Party, or the Catholic church. RCW 10.95.020(6) does not limit the structure or size of such a group or the nature of its ideology because such qualifiers are not necessary.

No. 26, Exh. 23, at 12-13.

The appellate court next reviewed the testimony from Mr. Monschke's trial to determine whether white supremacy falls within the meaning of the statute's terms. The court focused on the testimony of the two experts on white supremacist groups and ideology, Dr. Mark Pitcavage and Dr. Randy Blazak, and concluded that "[u]nder the plain language of RCW 10.95.020(6), white supremacy is an 'identifiable group' with a 'hierarchy.'" *Id*. at 13.

As Pitcavage explained, white supremacists share a set of beliefs and customs and are bound together by a mission to "secure the existence of our race and a future for white children." 25 RP at 1598. Both Pitcavage and Blazak agreed that this mission embodies the white supremacist ideology. Also, according to Pitcavage, white supremacists have a "hierarchy." The hierarchy is not in the formal militaristic or corporate sense, but in a "social standing" sense: "[S]omeone who's perceived to be really standing up for the white race, really being a white warrior, gets more result of status, gets more respect." 25 RP at 1635.

REPORT AND RECOMMENDATION - 20

Blazak's testimony also supports the conclusion that white supremacy falls within RCW 10.95.020(6). The thrust of Blazak's testimony was that white supremacy was not an "identifiable group" because, if it was, it would be "[a] very broad-based group," similar to "people who are liberal, people who are conservative, environmentalists, pro death penalty people." 34 RP at 2957–58. But the breadth of the group base is immaterial provided that the group is identifiable, has a hierarchy, and shares an ideology. As Blazak testified, white supremacists are a "finite number of people" who can be "identified" by their common ideology that "white people are superior and the white race is somehow threatened." 34 RP at 2923–24. Thus, both Pitcavage and Blazak's testimony reflected that white supremacy falls within the plain language of RCW 10.95.020(6).

ECF No. 26, Exh. 23, at 13-14.

After concluding that white supremacy was an identifiable group within the meaning of

RCW 10.95.020(6), the Court of Appeals rejected Mr. Monschke's vagueness challenge to the

statute:

A statute is vague if it does not give fair notice of the proscribed conduct or clear standards to prevent arbitrary enforcement. *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993). But a statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his questionable actions are prohibited. *City of Seattle v. Eze*, 111 Wn.2d 22, 27, 759 P.2d 366 (1988). It is sufficiently definite if persons of ordinary intelligence can understand the statute's meaning, notwithstanding some possible areas of disagreement. *Eze*, 111 Wn.2d at 27. A statute "employ[ing] words with a well-settled common law meaning, generally will be sustained against a charge of vagueness." *Anderson v. City of Issaquah*, 70 Wn. App. 64, 75, 851 P.2d 744 (1993). We assess a vagueness challenge to a statute not implicating First Amendment rights in light of the statute's application to the case at hand. *Halstien*, 122 Wn.2d at 117.

As previously discussed, the term "group" is not ambiguous and its plain dictionary meaning includes white supremacy. A person of ordinary intelligence would understand that committing murder to advance one's position as a white supremacist is prohibited by RCW 9A.32.030 and RCW 10.95.020(6). Monschke's vagueness challenge fails accordingly.

ECF No. 26, Exh. 23, at 15-16.

REPORT AND RECOMMENDATION - 21

There was nothing unreasonable or unforeseeable about the state court's analysis and construction of RCW 10.95.020(6). The court used dictionary definitions of such common terms as "group," "identifiable," and "hierarchy" as contained in the statute. The Washington Court of Appeals' adjudication of the vagueness challenge was a reasonable application of the governing "fair notice" principles announced by the United States Supreme Court. The state court's decision is entitled to deference under 28 U.S.C. § 2254(d). Thus, Mr. Monschke's claim that that RCW 10.95.020(6) is unconstitutionally vague should be denied.

The undersigned recommends that Claim 1 be denied.

**B.      Claim Two – RCW 10.95.020(6) Punishes First Amendment-Protected Activity**

In his second ground for relief Mr. Monschke complains that RCW 10.95.020(6), as construed by the Washington Court of Appeals, unconstitutionally authorizes punishment for the exercise of free speech and association rights under the First Amendment. ECF No. 1, at 7; ECf No. 30, at 15-20. He argues that the jury was permitted to consider and punish him for his constitutionally protected beliefs and associations. He argues that his case is "akin" to *State v. Rupe,* 101 Wash.2d 664, 683 P.2d 571 (Wash. 1984) and "mirrors" *Dawson v. Delaware,* 505 U.S. 159, 112 S.Ct. 1093 (1992).

In *Rupe,* the Washington Supreme Court held that a defendant's constitutional right to possess weapons could not be used against him in a criminal trial completely unrelated to the use of those weapons. *Rupe,* 683 P.2d at 596. In *Dawson,* the United States Supreme Court held that the defendant's membership in the Aryan Brotherhood had no relevance to the sentencing proceeding when that membership was not in any way tied to the murder of his white victim. *Dawson,* 503 U.S. at 166. In this case, however, the record reflects that evidence of Mr. Monschke's hate-based beliefs and his affiliation with groups advocating violence was

REPORT AND RECOMMENDATION - 22

offered to and did tend to explain his motive for attacking a white homeless stranger who was a possible drug user. The evidence established and explained the plan for Frye and Butters to earn "red shoelaces" and "bolts", and for Mr. Monschke to advance his status as a white supremacist. The evidence also made it more probable that Townsend's murder was premeditated.

The testimony and other evidence admitted at Mr. Monschke's trial included, *e.g.*, Monschke's repeated use of racial epithets, (ECF No. 26, Exh. 4, at 1381-83); his possession of white supremacist literature, musical recordings, and paraphernalia, such as flags, books, flyers, and pamphlets (*id.*, Exh. 7, at 1782-95, *see also* Exh. 6, at 10-18, 25-48, Exh. 12, at 2585-90; his association with white supremacy group members and leaders and attendance at gatherings of "skinheads" (*id.*, Exh. 6, at 179, 182-83; *see also* Exh. 12, at 2600-01); his repeated viewing and apparent enjoyment of the film *American History X*, particularly the violent "curb stomping" scene in that film (*id.*, Exh. 12, at 2588-90); his effort to recruit others to white supremacy (*id.*, Exh. 6, at 13-17, 25-26); and his postings on racist Internet message boards (*id.*, Exh. 12, at 2663-68; Exh. 13, at 2686, 2689-2700). The admissibility of the white supremacist literature and paraphernalia was the subject of the State's motion in limine. The trial court heard argument and made rulings on an item-by-item basis. ECF No. 26, Exh. 2, 1093-1141. The trial court admitted the evidence of Mr. Monschke's white supremacist views but on several occasions gave the jury an instruction limiting the purpose for which the jury could consider the evidence. *See*, *e.g*., ECF No. 26, Exh. 7, 1787 ("Evidence regarding white suprem[ac]ist literature and materials seized at the defendant's residence is being admitted for the purpose of proving motive, premeditation and for the circumstances surrounding the alleged crime. You must not consider the evidence for any other purpose.").

REPORT AND RECOMMENDATION - 23

The Washington Court of Appeals rejected Mr. Monschke's claim that the admission of this evidence violated his right to engage in First Amendment protected activity:

> Monschke asserts that "[i]t is error to permit the state to ask the jury to draw negative inferences from the exercise of any constitutional right." Br. of Appellant at 48. We note, as the Washington Supreme Court has, that "there is a distinction between making speech the crime itself, or an element of the crime, and using speech to *prove* the crime." *Halstien,* 122 Wn.2d at 125 (quoting *State v. Plowman,* 314 Or. 157, 167, 838 P.2d 558 (Or. 1992), *cert. denied,* 508 U.S. 974 (1993)). "The First Amendment … does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Halstein,* 122 Wn.2d at 125 (alteration in original) (quoting *Mitchell,* 508 U.S. at 489). Evidence of a defendant's exercise of a First Amendment right may be admissible when relevant to an issue in the case. *Campbell,* 78 Wn.App. at 822; *see, e.g., United States v. Abel,* 469 U.S. 45, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984) (prosecution could establish a defense witness's bias by showing that both the defendant and the witness were members of the Aryan Brotherhood and that members were sworn to lie for each other); *Barclay v. Florida,* 463 U.S. 939, 949, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983) (plurality) (trier of fact could consider "the elements of racial hatred" in the crime as well as the defendant's "desire to start a race war" in assessing whether the crime was "especially heinous, atrocious, or cruel").

> No authority supports Monschke's claim that admitting evidence of his affiliations and beliefs was reversible error and automatic violation of his constitutional rights. *Contra Dawson v. Delaware,* 503 U.S. 159, 165, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) ("[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs are protected by the First Amendment."). The question of trial court error in allowing such evidence depends on whether this evidence was relevant and admissible to prove an element of aggravated first degree murder charge. The relevance threshold is "very low." *State v. Darden,* 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401. We review the decision to admit evidence for abuse of discretion. *State v. Thang,* 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

> Monschke argues that the trial court erred in concluding that white supremacist evidence was admissible under ER 404(b). That rule prohibits evidence of prior acts to prove the defendant's propensity to commit the charged crime. But evidence of a defendant's prior acts may be admitted for other limited purposes under ER 404(b), including to establish motive, intent, and to explain the circumstances surrounding the alleged crime. *State v. Brown,* 132 Wn.2d,

570-71, 940 P.2d 546 (1997), *cert. denied,* 523 U.S. 1007 (1998); *State v. Cook,* 131 Wn. App. 845, 849-50, 129 P.3d 834 (2006). Evidence of membership in a group may be relevant evidence of premeditation and a defendant's motive when there is a sufficient nexus between the group affiliation and the motive for committing the crime. *State v. Boot,* 89 Wn. App. 780, 789, 950 P.2d 964, *review denied,* 135 Wn.2d 1015 (1998); *Campbell,* 78 Wn. App. at 822. Such evidence is also admissible under RCW 10.95.020(6) to establish that the defendant committed murder to advance his position in the hierarchy of an organization, association, or identifiable group.

Monschke's entire ER 404(b) argument is as follows:

[T]he only connection between the "white supremacist" evidence introduced at trial, [Monschke] and premeditation or motive was the inference that a person who believes in the supremacy of the white race is the kind of person who would commit a murder. … This is the precise inference forbidden by ER 404(b).

Br. of Appellant at 58-59. But Monschke incorrectly summarizes the evidence presented at trial. According to the record, the evidence admitted at trial not only established Monschke's belief in the superiority of the "white race," but also Monschke's hatred and hostility toward anyone he deemed inferior. This evidence included: literature, paraphernalia, and pictures associated with the Nazi movement and the highly violent subgroup, National Alliance; literature denigrating minorities; and a movie Monschke particularly enjoyed because of a scene where a minority is shot and curb stomped. Monschke's hate-based beliefs and his affiliation with groups advocating violence did tend to explain Monschke's motive for attacking a white homeless stranger who was a possible drug user. The evidence established and explained the plan for Frye and Butters to earn red shoelaces and bolts, and for Monschke to advance his status as a white supremacist. The evidence made it more probable that Townsend's murder was premeditated. ... In addition, the evidence explained the circumstances surrounding the crime, including the apparent "curb stomping" of Townsend's head as he lay on the railroad track. The court did not abuse its discretion in admitting evidence that Monschke was affiliated with white supremacist groups.

ECF No. 26, Exh. 23, at 21-24 (citing *State v. Stenson*, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997)).

As discussed above, RCW 10.95.020(6) is not aimed at constitutionally protected conduct. The statute is content neutral and requires an enhanced punishment for committing murder if the murder was committed to obtain, maintain, or advance one's position in the

REPORT AND RECOMMENDATION - 25

hierarchy of an organization, association, or identifiable group. Mr. Monschke was not prosecuted for expressing white supremacist views or for his association with persons who held such views. He was convicted of the premeditated murder of Randall Townsend. The Washington Court of Appeals reasonably concluded that evidence of Mr. Monschke's hate-based beliefs and affiliations tended to prove his motive for killing Mr. Townsend and made it more probable that the murder was premeditated.

Federal law is not to the contrary. "The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Mitchell*, 508 U.S. at 489. Allowing a jury to draw logical conclusions about the defendant's state of mind based on evidence of the defendant's protected speech does not interfere with the exercise of the right to speak. *Dressler v. McCaughtry*, 238 F.3d 908, 915 (7th Cir. 2001).

The Washington Court of Appeals' decision that the white supremacy evidence was relevant and admissible was neither contrary to, nor an unreasonable application of Supreme Court precedent governing similar First Amendment claims. Thus, the undersigned finds that Mr. Monschke is not entitled to federal habeas relief on this claim and that Claim 2 should be denied.

**C.      Claim 3 – Limiting Jury Instruction – Evidence of White Supremacist Beliefs**

In his third ground for relief Mr. Monschke asserts that the trial court's limiting instruction concerning the jury's consideration of his white supremacist literature and materials allowed the jury to consider First Amendment-protected conduct as evidence of guilt. ECF No. 1, at 8; ECF No. 30, at 20-22.

The challenged instruction told the jury that "[e]vidence regarding white suprem[ac]ist literature and materials seized at the defendant's residence is being admitted for the purpose of proving motive, premeditation and for the circumstances surrounding the alleged crime. You must not consider the evidence for any other purpose." ECF No. 26, Exh. 7, at 1787. The Washington Court of Appeals rejected Mr. Monschke's claim that this limiting instruction allowed the jury to consider First Amendment-protected conduct as evidence of guilt:

> Here, the court's limiting instruction told the jury that it could consider the white supremacist evidence only to establish motive, premeditation, and to explain the circumstances surrounding the alleged crime. As we discussed above, the evidence was relevant and properly admitted for the jury's consideration on these issues. The instruction accurately stated the law and the legally permissible limits of the evidence. The trial court did not comment on the evidence by giving this limiting instruction.

ECF No. 26, Exh. 23, at 24-25.

The law presumes that juries follow their instructions. *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727 (2000); *United States v. Olano*, 507 U.S. 725, 740, 113 S.Ct. 1770 (1993); *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965 (1985). More particularly, juries are presumed to follow cautionary or limiting instructions. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702 (1987) (describing this presumption as an "almost invariable assumption of the law"); *Tennessee v. Street*, 471 U.S. 409, 414-15, 105 S.Ct. 2078 (1985) (trial court's limiting instruction, regarding admission of confession of defendant's accomplice to rebut defendant's claim that his own confession was the product of coercion, was adequate to protect defendant's Confrontation Clause rights); *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843 (1983); *Brown v. Ornoski*, 503 F.3d 1006, 1018 (9th Cir. 2007). "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable

practical accommodation of the interests of the state and the defendant in the criminal justice process." *Richardson*, 481 U.S. at 211.

The Washington Court of Appeals confirmed that the white supremacist evidence was admissible in Mr. Monschke's case to prove motive, intent, and the circumstances surrounding the trial. The Washington Court of Appeals also confirmed that the trial court's limiting instruction properly explained the limited purposes for which the evidence was being admitted. Clearly established federal law holds that a limiting instruction under these circumstances is sufficient to prevent the jury from considering the evidence for any other purpose.

The Washington Court of Appeals' decision concerning Mr. Monschke's challenge to the limiting instruction used in his case is entitled to deference under 28 U.S.C. § 2254(d). The undersigned concludes that Claim 3 should be denied.

**D.  Claim 4 – Confrontation Clause Violations**

In his fourth claim for federal habeas relief, Mr. Monschke argues that the trial court's rulings denied him the Sixth Amendment right to confront and cross-examine co-defendant David Pillatos, State's expert Dr. Mark Pitcavage, and Detective Jeffrey Shipp. ECF No. 26, at 10, 31-32; ECF No. 30, at 23-39.[2]

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against

---

[2] In his reply, Petitioner presented at least two new claims regarding Dr. Pitcavage's testimony. He claims that allowing the state to introduce expert testimony on the issue of whether "white supremacy" is an identifiable group within the meaning of the aggravated murder statute invaded the province of the jury and violated his right to a jury determination of a fact relevant to his sentence in violation of the principles articulated in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and that Dr. Pitcavage's testimony was inadmissible under ER 702 because it was not based on theories or principles generally accepted in any scientific or academic community. ECF No. 30, at 26-32. Because arguments cannot be raised for the first time in a reply, *see Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994), the Court has not considered these claims.

him." U.S. Const. Amend. VI.  The Confrontation Clause applies to the states through the

Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065 (1965), and it

guarantees criminal defendants the right to confront and cross-examine the witnesses against

them. *Chambers v. Mississippi*, 410 U.S. 284, 294-95, 93 S.Ct. 1038 (1973).  "The main and

essential purpose of confrontation is to secure for the opponent the opportunity of cross-

examination." *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105(1974).  But the

defendant's right to cross-examination is far from absolute.  "[T]rial judges retain wide latitude

. . . to impose reasonable limits on . . . cross-examination based on concerns about, among

other things, harassment, prejudice, confusion of the issues, the witness' safety, or

interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S.

673, 679, 106 S.Ct. 1431 (1986); *see also Davis v. Alaska*, 415 U.S. at 316 (cross-examination

is "[s]ubject always to the broad discretion of a trial judge").  The defendant will meet his

burden of showing a violation of the right to confrontation only if he shows that a reasonable

jury might have received a significantly different impression of the witness's credibility had

the defense been permitted to pursue its proposed line of cross-examination.  *Van Arsdall*, 475

U.S. at 680.  In essence, what the Constitution guarantees is "an *opportunity* for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292 (1985)

(emphasis in original).  Violations of the right to confrontation are subject to the harmless error

standard. *Van Arsdall*, 475 U.S. at 684.

### 1.    David Pillatos

The State intended to call David Pillatos, one of the co-defendants in the murder, as a

witness during its case-in-chief.  Prior to his testimony, Pillatos's defense counsel asked the

REPORT AND RECOMMENDATION - 29

court to inquire, outside the jury's presence, whether Pillatos would refuse to testify – Pillatos had instructed his attorney to inform the prosecution he would refuse to answer any questions. ECF No. 26, Exh. 9, at 2017-18. Counsel was not certain whether his client's refusal to testify was based on the Fifth Amendment but did not want the court to plant that idea. *Id*. at 2018-19. The court inquired of Pillatos whether it was true he would refuse to testify. *Id*. at 2022. Pillatos confirmed he would not testify but stated his refusal was not based on the Fifth Amendment; the sole reason he would not answer any questions was because he did not want to assist the State in any way. *Id*. ("I ain't helping the prosecutors out. I don't like them."). He did, however, state he would answer any questions posed to him by Mr. Monschke's defense counsel. *Id*. at 2023-26.

In the presence of the jury, Pillatos was called as a witness and stated his name for the record. *Id*. at 2029. He refused to answer any substantive questions posed by the prosecutor, however. *Id*. ("I politely refuse to answer any questions."). He acknowledged he could be held in contempt for refusing to answer, but he again indicated he would answer questions posed by defense counsel. *Id*. at 2029-30. The prosecutor then "defer[red] to the defense." *Id*. at 2030. Defense counsel began questioning Pillatos, using leading questions. *Id*. The prosecutor objected and asked that the defense's examination be in the form of non-leading questions. *Id*. Defense counsel insisted he should be allowed to pose leading questions to Pillatos: "This is cross-examination." *Id*. The court, however, corrected defense counsel – "It's not cross-examination" – and indicated that counsel should conduct a direct examination. *Id*. ("If you wish to ask questions, it will have to be in the manner of direct testimony."). Defense counsel chose to proceed and conducted a 70-page direct examination of Pillatos. *Id*. at 2031-2101.

The state cross-examined, *id.* at 2101-25, and the defense followed with a redirect examination in which the court allowed the use of some leading questions. *Id.* at 2126-38.

The next morning, the defense moved for a mistrial arguing that the situation involving Pillatos's "unpredictable and unpreventable" behavior rendered the trial unfair. Specifically, defense counsel alleged that some of Pillatos's disrespectful, sarcastic, and "bizarre" answers, as well as his demeanor while testifying, adversely affected Mr. Monschke's case. ECF No. 26, Exh. 10, at 2149-51. The defense argued that (1) Pillatos had testified on direct about a supposed organization called the "Gay Aryan Skinheads," *see* Exh. 9, at 2072; and (2) on cross-examination by the State, Pillatos accused Detective Ringer and deputy prosecutor Greg Greer of placing the victim's body on the railroad tracks and stomping on the victim's head, *see id.* at 2125. *Id.*, Exh. 10, at 2151.

The court denied the motion for a mistrial. ECF No. 26, Exh. 10, at 2155. The court observed that it appeared the defense had a change of heart and now regretted the choice it made the day before to question Pillatos at all. *Id.* The court noted that Pillatos did not act out in any way and, although some of his answers were unusual, he did nothing to warrant granting a mistrial. *Id.*

The Washington Court of Appeals rejected Mr. Monschke's argument that the trial court abused its discretion by prohibiting him from asking Pillatos leading questions:

> Monschke did not ask to have Pillatos declared a hostile witness, *see* ER 611(c), nor does he explain how the court's ruling precluding his use of leading questions prejudiced his defense. In addition, because Pillatos refused to answer the State's questions, there was no testimony to cross-examine Pillatos about. *See* ER 611(b)-(c) (cross-examination should be limited to the subject matter of the direct examination; leading questions generally permissible for cross-examination but not direct examination). The court thus had a reasonable basis for requiring Monschke's questioning to be in the form of a direct examination just as it would

have done if the defense had called Pillatos to the stand out of order in the middle of the State's case-in-chief. The trial court did not abuse its discretion here.

ECF No. 26, Exh. 23, at 31.

The record clearly reflects that Mr. Monschke was not deprived of the opportunity to "confront" Pillatos. To label Pillatos a witness "against" Monschke would ignore the fact that Pillatos did not testify for the State at all. The trial court's ruling requiring the defense to ask non-leading questions does not present a federal constitutional ground for relief. The manner in which evidence is presented at trial is a matter largely left to the trial court's broad discretion. *Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir. 2008). There is no clearly established Supreme Court precedent that would have required the trial court to proceed in a different manner.

The decision of the Washington Court of Appeals on this issue was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. The state court's decision is entitled to deference under 28 U.S.C. § 2254(d), and the undersigned recommends that this claim for federal habeas relief be denied.

2. **Dr. Pitcavage**

The State brought a motion in limine to exclude certain cross-examination of the State's expert, Dr. Mark Pitcavage. Pitcavage was employed as the Director of Fact Finding for the Anti-Defamation League (ADL) since 2000. ECF No. 26, Exh. 5, at 1584-86. The State sought to exclude any cross-examination about a civil suit brought against the ADL in the 1980s by a Colorado couple who alleged they had been defamed by the ADL's accusation that they were anti-Semitic. *Id*. at 1577-79. Defense counsel asserted that this information was relevant to establishing the witness's bias and the "organizational bias" of the ADL. *Id*. at

1579.  The trial court stated it would allow the defense to ask questions with regard to any bias

or prejudice on the part of Dr. Pitcavage and the ADL, but drew the line at inquiry about a

lawsuit against the ADL many years earlier: "I'm not going to turn this trial into a trial to [sic]

the ADL.  I'm not going to allow any of this information unless you can tie it to this witness."

*Id.* at 1582.

The Washington Court of Appeals upheld the trial court's ruling:

> The court's refusal to permit questioning on this point was a proper
> exercise of its discretion: the court did allow Monschke to explore any bias
> or prejudice of the ADL, but the lawsuit Monschke sought to raise was remote,
> isolated, and had not involved Pitcavage.  Thus, it was an attempt to impeach on a
> collateral matter and irrelevant.  *State v. Descoteaux*, 94 Wn.2d 31, 37-38, 614
> P.2d 179 (1980) (witness cannot be impeached on an issue collateral to the issue
> being tried; issue is collateral if it is not admissible independently of the
> impeachment purpose), *overruled on other grounds by State v. Danforth*, 97
> Wn.2d 255, 257 n. 1, 643 P.2d 882 (1982).

ECF No. 26, Exh. 23, at 31.

This holding is not inconsistent with the "wide latitude" given to trial judges under the

Sixth Amendment.  *Delaware v. Van Arsdall*, 475 U.S. at 679; *see also Davis v. Alaska*, 415

U.S. at 316 (cross-examination is "[s]ubject always to the broad discretion of a trial judge").

Mr. Monschke meets his burden of showing a violation of the right to confrontation only if he

shows that a reasonable jury might have received a significantly different impression of the

witness's credibility had the defense been permitted to pursue its proposed line of cross-

examination.  *Van Arsdall*, 475 U.S. at 680.  As the state courts correctly noted, a lawsuit against

the ADL that occurred over a decade before Pitcavage was employed at the ADL is clearly

collateral to the issue of whether the information presented by Pitcavage at trial was truthful

and reliable.

REPORT AND RECOMMENDATION - 33

The decision of the Washington Court of Appeals on this issue was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. The undersigned recommends that this claim for federal habeas relief be denied.

**3.     Detective Jeffrey Shipp**

Mr. Monschke alleges that Detective Jeffrey Shipp's testimony was based in part on testimonial hearsay and by allowing this testimony, the trial court denied him his Sixth Amendment right to confront and cross-examine the absent witnesses. ECF No. 1, at 32; ECF No. 30, at 35-39.

Detective Shipp, one of the main law enforcement investigators in the case, explained what the managers of the Rich Haven Apartments told him about Mr. Monschke's co-defendants Scotty Butters, Tristain Frye, and David Pillatos when they had briefly resided at the Rich Haven Apartments shortly before the murder took place. The three were evicted from their apartment for yelling racial slurs at passersby on the sidewalk below, for painting distinctive racist graffiti on the apartment building, and for Butters' actions in selling imitation crack cocaine to a drug addict. ECF No. 26, Exh. 6, at 136-51. The State presented this testimony to explain how Detective Shipp's investigation led him to focus on Butters, Frye, and Pillatos, mainly because the graffiti at the crime scene was similar to the graffiti found at the Rich Haven Apartments. The defense did not object to the apartment managers' out-of-court statements, either on hearsay grounds or any other basis, and it appears the defense wanted this evidence presented. The defense adduced similar information in its cross-examination of Detective Shipp, emphasizing the point that the evidence did not pertain to Mr. Monschke. *See id*. at 186-88; Exh. 7, at 1729-30.

REPORT AND RECOMMENDATION - 34

The "principal evil" at which the Confrontation Clause is directed is the use of ex parte examinations or formal statements to government officers as evidence against the accused. *Crawford v. Washington*, 541 U.S. 36, 50-53, 124 S.Ct. 1354 (2004). The governing rules announced by the Supreme Court in its Confrontation Clause cases reflect this focus and carefully distinguish between testimonial and non-testimonial hearsay because "not all hearsay evidence implicates the Sixth Amendment's core concerns." *Id*. at 51. Under the *Crawford* standard, "testimonial" hearsay may not be introduced against a defendant unless (1) the declarant is unavailable at trial, and (2) the defendant had a prior opportunity to cross-examine the declarant. *Id*. at 68-69. In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266 (2006), the Court clarified that nontestimonial hearsay is not subject to the Confrontation Clause at all. "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Id*. at 821 (citing *Crawford*, 541 U.S. at 51). *See also Whorton v. Bockting*, 549 U.S. 406, 420, 127 S.Ct. 1173 (2007) (Confrontation Clause has no application to non-testimonial statements). The State agreed that the statements attributed to the apartment managers were testimonial.

The Confrontation Clause does not apply to out-of-court statements, even if testimonial in nature, that are admitted for purposes other than establishing the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n. 9 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 1985)). *See United States v. Hicks*, 575 F.3d 130, 143-44 (1st Cir. 2009) (recorded statements made by defendant's girlfriend during jail phone call from defendant were admitted not to prove the truth of the matter asserted but to provide context for defendant's admissions; thus, no Confrontation Clause implications); *Moses v. Payne*, 555 F.3d 742, 755-56 (9th Cir. 2009) (out-of-court statement regarding defendant's prior assault of murder victim introduced not to

REPORT AND RECOMMENDATION - 35

prove the truth of the matter asserted but rather to explain why social worker contacted Child Protective Services; not violative of Confrontation Clause); *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006) (statements of confidential informant made during recorded conversation with defendant were admissible to place defendant's admissions on the tapes into context, thereby making defendant's admissions intelligible for the jury; no Confrontation Clause violation because the declarant was not a witness against the defendant); *United States v. Hendricks*, 395 F.3d 173, 183-84 (3d Cir. 2005) (same).

Violations of the Confrontation Clause involving the admission of testimonial hearsay are subject to harmless error analysis. *Melendez-Diaz v. Massachusetts*, 557 U.S. __, __ n. 14, 129 S. Ct. 2527, 2542 n.14 (2009); *Moses v. Payne*, 555 F.3d at 755. On direct appeal such errors are reviewed under the "harmless beyond a reasonable doubt" standard. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431 (1986); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824 (1967). On collateral review, the question is whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993); *Moses v. Payne*, 555 F.3d at 755.

The Washington Court of Appeals rejected Mr. Monschke's claim that the apartment managers' out-of-court statements violated his Confrontation Clause rights:

> It is unnecessary for us to address whether a defendant may raise a testimonial hearsay objection for the first time on appeal, even assuming he can, there was no error here as the testimony was not hearsay. The State offered Detective Shipp's testimony to explain the context and background of the criminal investigation and how the investigation came to focus on Monschke, Butters, Frye, and Pillatos; it was not offered to prove that Monschke's cohorts were in fact yelling racial slurs, painting racist graffiti, or selling imitation drugs. Such background testimony is not hearsay. *See State v. Lillard*, 122 Wn. App. 422, 437, 93 P.3d 969 (2004), *review denied*, 154 Wn.2d 1002, 113 P.3d 482 (2005); *State v. Post*, 59 Wn. App. 389, 394–95, 797 P.2d 1160 (1990), *aff'd*, 118 Wn.2d 596, 826 P.2d 172 (1992).

REPORT AND RECOMMENDATION - 36

Furthermore, even if we assume that the statements were testimonial hearsay, which we do not, any error in admitting the statements was harmless beyond a reasonable doubt. The events at the Rich Haven Apartments reflected a pattern of alarming behavior by Butters, Frye, and Pillatos, but it did not directly inculpate Monschke. Moreover, the events Detective Shipp recounted were cumulative of Butters, Frye, and Pillatos's testimony regarding their own racist conduct. We find no merit in Monschke's claim that Detective Shipp's testimony was prejudicial or that it violated his constitutional right to confront witnesses.

ECF No. 26, Exh. 23, at 27-28 (footnote omitted).

The record supports the state court's reasoning. The apartment managers' out-of-court statements were not admitted to prove the truth of the matter asserted. Rather they were offered for the non-hearsay purpose of explaining how Detective Shipp's initial investigation led him to focus on Butters, Frye, and Pillatos, which subsequently led him to investigate Mr. Monschke. Even if the statements were testimonial hearsay, any error in admitting the evidence was harmless because none of the information contained in the apartment managers' out-of-court statements pertained to Mr. Monschke.

The Washington Court of Appeals' adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law for purposes of 28 U.S.C. § 2254(d). Therefore, the undersigned recommends that Claim 4 be denied.

## E.    Claim 5 – Testimony of Randy Blazak

In his fifth ground for federal habeas relief, Mr. Monschke argues the trial court denied him his right under the Compulsory Process Clause of the Sixth Amendment to present a defense. Specifically, he takes issue with the trial court's ruling that he could not ask the defense expert, Dr. Randy Blazak, about the phenomenon of white supremacist gangs in juvenile institutions. ECF No. 1, at 32-33; ECF No. 30, at 40-41.

REPORT AND RECOMMENDATION - 37

The Constitution guarantees criminal defendants the right to a meaningful opportunity to present a complete defense, and it forbids the states from applying arbitrary rules of evidence that exclude important defense evidence. *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, (2006); *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038 (1973); *Washington v. Texas*, 388 U.S. 14, 2387 S.Ct. 1920 (1967). This right stems from the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *Holmes*, *supra*. The Constitution, however, does not grant a criminal defendant an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646 (1988). Even the right to present relevant testimony is not without limitation. *Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704 (1987). The defense, no less than the State, must comply with "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 301; *see also Michigan v. Lucas*, 500 U.S. 145, 151-52, 111 S.Ct. 1743 (1991). "The mere invocation of [the right to present a defense] cannot automatically and invariably outweigh countervailing public interests." *Taylor*, 484 U.S. at 414.

A trial court's exclusion of defense evidence under established evidence rules ordinarily does not implicate any constitutional considerations because the Constitution gives trial judges considerable leeway to exclude evidence. *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261 (1998); *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431 (1986). "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they

are designed to serve'." *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. at 56; *Michigan v. Lucas*, 500 U.S. at 151). What the Constitution prohibits is the exclusion of critical, trustworthy defense evidence, particularly where the evidence directly refutes the State's allegations. *See, e.g., Holmes, supra* (rejecting as arbitrary a state rule excluding evidence of a third party's commission of the charged crime where the rule made admissibility of such evidence turn on the strength of only the prosecution's evidence); *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142 (1986) (blanket exclusion of defense evidence concerning the circumstances surrounding defendant's confession violated right to present a defense where his sole defense was that there was no physical evidence otherwise linking him to crime and that his confession was unreliable); *Chambers, supra* (arbitrary application of Mississippi's "voucher" rule and hearsay rule, which effectively prevented the defendant in a murder prosecution from presenting evidence of a witness's confessions to the same murder and from impeaching the witness on the basis of his confessions); *Washington v. Texas*, 388 U.S. at 23 (arbitrary application of procedural statute preventing co-defendants or co-participants from testifying for one another violated right to present a defense by excluding "a witness who was physically and mentally capable of testifying to events that he had personally observed."); *cf. Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150 (1979) (per curiam) (exclusion of defense mitigation evidence during penalty phase of capital murder trial violated due process where defendant attempted to show he was not present at time murder was committed by co-defendant).

Conversely, the Constitution permits trial judges to apply well-established evidence rules to exclude evidence if its probative value is outweighed by other factors such as unfair prejudice, confusion of the issues, or the potential to mislead the jury. *Holmes*, 547 U.S. at

REPORT AND RECOMMENDATION - 39

326-27 (describing such rules of evidence as "familiar and unquestionably constitutional") (quoting *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013 (1996)); *Moses v. Payne*, 555 F.3d 742, 757-58 (9th Cir. 2009).

The defense called Dr. Blazak to testify as an expert in hate crimes and white supremacist groups. During his direct examination, defense counsel asked Dr. Blazak whether he had ever spoken with incarcerated youths in juvenile institutions and whether he had found an incidence of race-based gangs in juvenile institutions. ECF No. 26, Exh. 14, at 2915-16. After the prosecutor objected and out of the presence of the jury, defense counsel proffered that Dr. Blazak would testify that juveniles join white supremacy gangs as a means of protecting themselves from members of other gangs. *Id*. at 2916-17. The court asked defense counsel to explain the relevancy of that information:

> MR. BERNEBURG: It's relevant because it explains how Kurtis got involved, and corroborates his testimony.
>
> THE COURT: How is that relevant to the case?
>
> MR. BERNEBURG: That he's not a bad person, Your Honor. This is something that happened to Kurtis, not something that he chose to do.

ECF No. 26, Exh. 14, at 2917-18. The prosecutor objected on the ground that evidence of Mr. Monschke's character was not relevant and how or why he got involved in white supremacy groups was also irrelevant. *Id*. at 2918. The trial court sustained the State's objection. *Id*.

Prior to Dr. Blazak's testimony, Mr. Monschke had testified about his recruitment into a white power gang at the age of 12 when he was in a juvenile institution. ECF No. 26, Exh. 13, at 2754-57. He testified he joined because gangs drawn along racial lines were prevalent in the juvenile institution and it was safer to be in a gang than not. *Id*. The prosecutor cross-examined Mr. Monschke and inquired about his gang membership but the prosecutor did not

challenge the fact that Mr. Monschke may have joined a gang for reasons of personal safety. *Id.*, Exh. 14, at 2835-36.

The Washington Court of Appeals reviewed the trial court's evidentiary ruling and rejected Mr. Monschke's argument that the trial court denied him the right to present a defense. Exhibit 23, at 30-32.

> Monschke argues that Blazak's testimony was necessary to explain "why he might join a white gang in custody and how that might have explained his participation in white pride or white power activities." Br. of Appellant at 89. How Monschke came to join a race-based group might have been relevant in a death penalty phase, but it was not relevant in determining guilt; what was relevant was his current beliefs, his current associations, and how those beliefs and associations played a role in his murder of a white homeless man. The trial court did not abuse its discretion in excluding this irrelevant evidence.

ECF No. 26, Exh. 23, at 32.

Respondent argues that the trial court's relevancy determination and exclusion of this part of Dr. Blazak's proposed testimony was not an exercise of arbitrary judicial power. Evidence of the reasons why Mr. Monschke may have chosen to join a white gang while he was in juvenile confinement was not relevant to any issues in the case and would not have refuted the State's allegations. The undersigned agrees with this reasoning.

The Washington Appellate Court's holding was neither contrary to, nor an unreasonable application of, Federal law as it relates to claims regarding the admissibility of evidence in state criminal trials. Therefore, the undersigned recommends that Claim 5 be denied.

**F.      Claim 6 – Prosecutorial Misconduct (Direct Examination of Terry Hawkins)**

In his sixth ground for relief, Mr. Monschke contends the prosecutor committed misconduct during his direct examination of State's witness Terry Hawkins by asking whether

Hawkins had changed some of the details of his version of events at the urging of defense counsel.  ECF No. 1, at 33; ECF No. 30, at 42-46.

### 1.    Standard of Review

"The Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty."  *Mabry v. Johnson*, 467 U.S. 504, 511, 104 S.Ct. 2543 (1984), *abrogated in part on other grounds, Puckett v. United States,* 556 U.S. 129, n. 1, 129 S.Ct. 1423 (2009).  Mere improprieties or breaches of courtroom decorum by a prosecutor do not in themselves warrant federal habeas relief under 28 U.S.C. § 2254.  Unless the prosecutor's conduct prejudiced a specific constitutional right (such as the privilege against self-incrimination), federal habeas corpus claims alleging that a state prosecutor committed misconduct are reviewed under the narrow standard of due process rather than the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868 (1974).  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668 (1990).

Improper remarks or other conduct on the part of the prosecutor do not constitute a *per se* due process violation.  "[I]t 'is not enough that the prosecutor's remarks were undesirable or even universally condemned.' … The relevant inquiry is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. at 181.  Even overzealous or obnoxious conduct by a prosecutor does not automatically warrant federal habeas relief.  *Furman v. Wood*, 190 F.3d 1002, 1005-06 (9th Cir. 1999); *Thomas v. Cardwell*, 626 F.2d 1375, 1387 (9th Cir. 1980), *cert.*

*denied*, 449 U.S. 1089 (1981). Prosecutorial misconduct constituting a due process violation will warrant habeas relief only if the misconduct is prejudicial under the *Brecht* harmless error standard. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004). Under *Brecht* a trial error is presumed to be harmless unless the error had "substantial or injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### 2. Prosecutor's Questioning of Terry Hawkins

Mr. Monschke argues that the prosecutor improperly asked Terry Hawkins if he recalled saying that defense counsel and the defense investigators were trying to get him to say something that was not true. He argues that this line of questioning left the jury with the impression that defense counsel had acted improperly. ECF No. 1, at 33; ECF No. 30, at 42.

Terry Hawkins and Cindy Pitman were the two homeless persons who found Randall Townsend on the railroad tracks shortly after the beating. Hawkins testified on direct examination, in contradiction to his earlier statements, that when he first saw the victim's body on the tracks, "he was on his stomach, laying facedown." ECF No. 26, Exh. 3, at 1219. The prosecutor pressed him on this point and asked whether Hawkins recalled telling him just two weeks earlier that the victim was on his *back* rather than his front. *Id*. at 1226-27.

> Q.   Is someone talking to you and trying to get you to say something to help out Mr. Monschke?
>
> A.   No. I'm not trying to help out, just tell the truth about what I seen.
>
> Q.   Do you recall telling me when we were in my office that you were concerned that the defense attorneys and their investigators were trying to get you to say things that were not true?
>
> A.   I knew at the time that they was trying to help one of the defendants get off and so, I mean, I don't know exactly if they're doing their job or whatever they're doing. But they were just trying to find out exactly where did I see all of the people at on the track.

REPORT AND RECOMMENDATION - 43

Q.    Do you recall telling me after meeting with them you were concerned they were trying to get you to say things that were not true?

A.    Well, yes.  I probably told you that.

Q.    That was two weeks ago?

A.    I thought at the time that they was trying.  Not trying to make me lie, but just tell what I seen.  That's basically all they was letting me know, just tell the truth.

Q.    Between the time that I last talked to you and today, have you talked to the defense attorneys?

A.    Yes.

Q.    Have you discussed the issue of whether you saw Mr. Townsend on his back or stomach?

A.    No.

Q.    Not at all?

A.    No.

1228-1229.

Hawkins confirmed he had met with the defense attorneys between the time of his recent meeting with the prosecutor (during which he stated the victim was on his back) and his testimony in court.  *Id.*  He stated he had met with the defense attorneys on three separate occasions of about one hour each.  *Id.* at 1229-31.  Hawkins also revealed that during each of these defense interviews, the defense attorneys  stated their opinion that Mr. Monschke was innocent and related their theory of what they believed had occurred (and who did what) the night of the assault.  *Id.* at 1232-33.

The defense objected only twice during this line of questioning, once on the ground the prosecutor was leading the witness, the other time on the ground the prosecutor was not

REPORT AND RECOMMENDATION - 44

allowing the witness to answer.  *Id.* at 1233.  Later that day, after the prosecutor concluded his

direct examination, the defense moved for a mistrial on the basis of the prosecutor's questions

to Hawkins:

> When Mr. Hawkins was on the witness stand, Mr. Greer went to great lengths to attack Mr. Bauer and myself personally in terms of tampering with a witness.  What he was doing was exploiting the witness's confusion. Rather than dealing with any specific issues of testimony, he was exploiting the witness's confusion to cast counsel in a dim light and deprive Mr. Monschke or diminish our effectiveness as counsel.

> It was an improper examination, to deprive Mr. Monschke of his right to effective assistance of counsel.  We would ask the court to declare a mistrial.

ECF No. 26, Exh. 3, at 1258.  The trial court denied the motion.  *Id.*  The prosecutor did not

specifically refer to any of Hawkins' inconsistencies in closing argument nor did he suggest

any misconduct on defense counsel's part in closing.

The Washington Court of Appeals adjudicated this claim on the merits and rejected Mr.

Monschke's claim of prosecutorial misconduct:

> Monschke did not timely object to the prosecutor's questioning.  Instead his counsel waited until the State had completed its direct examination of Hawkins and then moved for a mistrial after the lunch recess.  *See State v. Gallo*, 20 Wn. App. 717, 728, 582 P.2d 558 ("An objection which comes after the witness has answered is not timely unless there was no opportunity to object or it was not apparent from the question that the answer would be inadmissible."), *review denied*, 91 Wn.2d 1008 (1978).  In addition, although the record does not reflect that the defense team acted improperly during the interview with Hawkins, in light of Hawkins's inconsistent testimony and his prior statement that he felt pressured to change his story, it was arguably appropriate to clarify Hawkins's testimony and explore the basis for his prior inconsistent statements.  *See ER 607* (either party may test the credibility of a witness); *State v. Russell*, 125 Wn.2d 24, 92–93, 882 P.2d 747 (1994) (defense counsel's conduct may be questioned if there is specific evidence in the record to support such an allegation), *cert. denied*, 514 U.S. 1129 (1995); *accord United States v. Patterson*, 23 F.3d 1239, 1248 (7th Cir.) (where witness' story changes after meeting with defense counsel, "[t]he prosecutor need not ignore the circumstances and evidence surrounding the prior inconsistent statements"), *cert. denied*, 513 U.S. 1007 (1994).

REPORT AND RECOMMENDATION - 45

ECF No. 26, Exh. 23, at 34.

The Seventh Circuit case referred to by the Washington Court of Appeals in its decision involved a situation similar to the one at issue here. In that case a witness changed his testimony after a meeting with defense counsel. *U.S. v. Patterson,* 23 F.3d 1239 (7th Cir. 1994). The opinion is instructive on the fine line between permissible advocacy and improper imputation of unethical behavior:

> We agree with the Ninth Circuit that it is improper to "state that defense counsel, in general, act[ed] in underhanded and unethical ways, and absent any specific evidence in the record, no particular defense counsel may be maligned." *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983), *cert. denied,* 469 U.S. 920, 105 S.Ct. 302 (1984). The defense counsel has a right to interview witnesses and the charge that the mere fact that such an interview takes place suggests that the defense counsel acted unethically is not justified. We find that the prosecutor's comments do not cross the very fine line between permissible advocacy, and improper imputation of unethical behavior. The prosecutor was commenting on facts that were in evidence, namely that the witness' story had changed in a short period of time and that he had met with defense counsel. The prosecutor need not ignore the circumstances and evidence surrounding the prior inconsistent statements. The jury is entitled to draw its own conclusions from all of the evidence. Although the defendant argues that the prosecutor's comments were tantamount to her insinuating that the defense counsel acted improperly, we do not agree. The comments, which were tied very closely to the evidence, were within the realm of permissible advocacy.

*U.S. v. Patterson*, 23 F.3d 1239, 1248 (7th Cir. 1994).

As in *Patterson,* the prosecutor here was commenting on facts that were in evidence, namely that Hawkins' testimony was inconsistent, that Hawkins had met with defense counsel, and that Hawkins had told the prosecutor that he had felt some pressure to change his story. Under these circumstances, the prosecutor had a good faith basis to test Hawkins' credibility and explore the basis for his prior inconsistent statement. As in *Patterson*, the jury was entitled to draw its own conclusions from all of the evidence.

REPORT AND RECOMMENDATION - 46

The Washington Court of Appeals' adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent governing due process claims premised on prosecutorial conduct at trial. Therefore, the undersigned recommends that Claim 6 be denied.

**G.      Claim 7 – Jury Instructions – Elements of Crime and State's Burden**

In his seventh ground for habeas relief Mr. Monschke argues that Instruction No. 12 (the "to-convict" instruction) relieved the State of its burden of proving every element of the offense of first-degree murder beyond a reasonable doubt. ECF No. 1, at 33-34; ECF No. 30, at 47-53.

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is 'whether the ailing instruction … so infected the entire trial that the resulting conviction violates due process.'" *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830 (2004). A jury instruction may not be viewed in artificial isolation but must be considered in the context of the instructions as a whole and the entire trial record. *Middleton*, *supra; Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475 (1991); *Boyde v. California*, 494 U.S. 370, 378, 110 S.Ct. 1190 (1990); *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S.Ct. 396 (1973). It is not enough that a challenged instruction is "undesirable, erroneous, or even 'universally condemned'." *Cupp v. Naughten*, 414 U.S. at 146. The reviewing court must determine "'whether there is a reasonable likelihood that the jury has applied that challenged instruction in a way' that violates the Constitution." *Middleton*, *supra* (quoting *Estelle v. McGuire*, *supra*). The "reasonable likelihood" standard from *Boyde* is the settled, single standard of review for jury instructions. *See Estelle v. McGuire*, 502 U.S. at 72

REPORT AND RECOMMENDATION - 47

n.4 (discussing and disapproving other standards that considered "how reasonable jurors could have" or "a reasonable juror would have" understood an instruction).

The context in which the instruction must be considered includes the charge as a whole, the evidence presented to the jury, and the arguments of counsel. *Boyde*, 494 U.S. at 383-86; *Jeffries v. Blodgett*, 5 F.3d 1180, 1195-96 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994). Even if the court finds a constitutional violation under the *Boyde* analysis, however, federal habeas relief may not be granted unless the court also finds that the error, "in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147, 119 S.Ct. 500 (1998).

Moreover, federal habeas relief is unavailable for perceived errors of state law, such as whether a jury instruction complies with state law. It is not the province of federal courts to reexamine state court conclusions regarding matters of state law. *Estelle v. McGuire*, 502 U.S. at 67-68, 71-72; *Gilmore v. Taylor*, 508 U.S. 333, 341-42, 113 S.Ct. 2112 (1993). Federal habeas review is limited to deciding whether the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). State courts are the ultimate expositors of a state's criminal law, including such matters as the definition of crimes and affirmative defenses, and their construction is binding on the federal courts. *McMillan v. Pennsylvania*, 477 U.S. 79, 85-87, 106 S.Ct. 2411 (1986). On habeas review, an "especially heavy" burden is placed on a petitioner who seeks to show constitutional error from a jury instruction used at his trial that parrots the language of a state statute. *Waddington v. Sarausad*, 555 U.S. 179, 190-91, 129 S.Ct. 823 (2009). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a

federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602 (2005).

The Washington Court of Appeals reviewed the instructions and concluded that they complied with Washington law on the crime of first-degree murder and accomplice liability. The trial court instructed the jury on the requirements of accomplice liability under RCW 9A.08.020 in Instruction No. 10, as well as the elements of first-degree murder under RCW 9A.32.030(1)(a) in Instruction No. 12, the "to-convict" instruction.[3]        Instruction No. 10 read as follows:

> A person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the crime.

> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

> A person is an accomplice in the commission of the crime of murder if, with knowledge that it will promote or facilitate the commission of the crime of murder, he or she either:

> (1) solicits, commands, encourages, or requests another person to commit the murder; or

> (2) aids or agrees to aid another person in planning or committing the murder.

> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than a mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

ECF No. 26, Exh. 21, App. D (Instruction No. 10).

---

[3] The trial court's instructions to the jury are all contained in Appendix D to Exhibit 21, the State's brief on direct appeal.

REPORT AND RECOMMENDATION - 49

Instruction No. 12 read as follows:

To convict the defendant of the crime of murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 23rd day of March, 2003, the defendant or a person to whom defendant was acting as an accomplice beat Randall Townsend;

(2) That the defendant or a person to whom defendant was acting as an accomplice acted with the intent to cause the death of Randall Townsend;

(3) That the intent to cause the death was premeditated;

(4) That Randall Townsend died as a result of defendant's or an accomplice's acts; and

(5) That the acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

ECF No. 26, Exh. 21, App. D (Instruction No. 12).

The "to-convict" instruction, considered in conjunction with the accomplice liability instruction, was a correct statement of Washington law. Washington's accomplice liability law requires only a mens rea of knowledge and an actus reus of soliciting, commanding, encouraging, or requesting the commission of the crime, or aiding or agreeing to aid in the planning or the commission of the crime. *State v. Roberts*, 142 Wn.2d 471, 502, 14 P.3d 713 (2000). Thus, under state law a person may be guilty of a substantive offense even if he does not have the same mens rea as that needed for the substantive offense and even though he is not involved in the actus reus for the substantive offense. *Id*. at 510-11. Under Washington law there is no distinction between guilt as a principal and guilt as an accomplice.

REPORT AND RECOMMENDATION - 50

The Washington state legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged the same as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. *State v. McDonald*, 138 Wn.2d 680, 688, 981 P.2d 443 (1999) (quoting *State v. Carothers*, 84 Wn.2d 256, 264, 525 P.2d 731 (1974)).

The Washington Court of Appeals rejected Mr. Monschke's claim that Instruction No. 12 misstated the requirements of state law. ECF No. 26, Exh. 23, at 35-36.

> The court's instructions were consistent with the rule that "[a] defendant charged as an accomplice to first degree murder may be convicted on proof that he knew generally he was facilitating a homicide, but need not have known that the principal had the kind of culpability required for any particular degree of murder." *State v. Mullin-Coston*, 115 Wn. App. 679, 692 n. 6, 64 P.3d 40 (2003) (discussing *State v. Roberts*, 142 Wn.2d 471, 512-13, 14 P.3d 713 (2000)), *aff'd*, 152 Wn.2d 107 (2004). The trial court properly instructed the jury on the elements of first degree premeditated murder and accomplice liability. Monschke's challenge to the instructions is without merit.

*Id*. at 35-36.[4]

The conclusion of the Washington Court of Appeals that Instruction No. 12 constituted a correct and unambiguous statement of Washington law is binding on federal habeas review. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). There was no due process violation. The state court's rejection of Mr. Monschke's jury instruction claim was neither contrary to, nor an unreasonable application of clearly established federal law for purposes of 28 U.S.C. §

---

[4] Respondent points out that the prosecutor argued this point at some length in closing argument, without any objection from the defense. *See, e.g.*, ECF No. 26, Exh. 15 at 3060-62. The Washington Court of Appeals on direct appeal also rejected Mr. Monschke's separate claim challenging the legal correctness of the prosecutor's argument concerning the requirements of accomplice liability. *Id.*, Exh. 23 at 36-37.

2254(d)(1).  This Court's inquiry ends there.  *Waddington v. Sarausad*, 555 U.S. at 192.  The undersigned recommends that Claim 7 be denied.

**H.     Claim 8 – Ineffective Assistance of Counsel**

In his eighth ground for federal habeas relief, Mr. Monschke claims that his defense attorneys provided ineffective assistance of counsel in violation of the Sixth Amendment when they failed to adequately prepare Dr. Randy Blazak, the defense expert on white supremacist organizations, to testify during trial.  He argues that parts of Dr. Blazak's testimony on cross-examination damaged his defense.  ECF. No. 1, at 35; ECF No. 30, at 54-61.

**1.     Legal Standard**

The primary question when reviewing a claim of ineffective assistance of counsel is not whether counsel provided ineffective representation or whether the state court erred in its analysis of the claim.  *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 1939 (2007).  The primary issue is whether the state court adjudication was unreasonable.  *Landrigan*, 127 S. Ct. at 1939; *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843 (2002).  The Court owes a great level of deference to the state court adjudication.  *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S.Ct. 1 (2003).  Because counsel has wide latitude in deciding how best to represent a client, review of counsel's representation is highly deferential.  *Id.*  Review is "doubly deferential when it is conducted through the lens of federal habeas."  *Id.* at 6.

To show ineffective assistance of counsel, a petitioner must satisfy a two-part standard.  First, the petitioner must show counsel's performance was so deficient that it "fell below an objective standard of reasonableness."  *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052 (1984).  Second, the petitioner must show the deficient performance prejudiced the defense so "as to deprive the defendant of a fair trial, a trial whose result is unreasonable."  *Id.*  The

REPORT AND RECOMMENDATION - 52

petitioner must satisfy both prongs to prove his claim of ineffective assistance of counsel. *Id*. at 697.

Under the first prong, the petitioner must specifically show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id*. at 689. Imposing a detailed set of rules "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id*. The Supreme Court has not articulated specific guidelines for appropriate attorney conduct. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527 (2003). Consequently, the proper measure remains reasonableness under prevailing professional norms. *Id*.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id*. Every effort must be made to "eliminate the distorting effects of hindsight," and to judge counsel's performance from counsel's perspective at the time of trial. *Id*. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The Court always applies this presumption of competence. *Id*. at 689.

Under the second prong, that the petitioner must prove prejudice from counsel's allegedly deficient representation. *Cullen v. Pinholster*, --- U.S. ---, 131 S.Ct. 1388, 1403 (2011). It is not enough that counsel's errors had "some conceivable effect on the outcome." *Strickland,* 466 U.S. at 693. Rather, the petitioner must show "that, but for counsel's unprofessional errors, the result would have been different." *Id*. at 694. The petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id*. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S.Ct. at 1403 (quoting *Harrington v. Richter,* --- U.S. ---, 131 S. Ct. 770, 791 (2011)).

### 2. Dr. Blazak's Testimony

RCW 10.95.020(6) provides that a first-degree murder is an aggravated first-degree murder if the defendant "committed the murder to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." The State alleged that the relevant group in Mr. Monschke's case was white supremacists and called Dr. Mark Pitcavage as an expert witness to support its theory. Defense counsel chose to call Dr. Randy Blazak to explain that white supremacists are not an identifiable group and that "Volksfront," the specific white supremacist organization to which Mr. Monschke belonged, was a nonviolent group.

Dr. Blazak was a tenured professor of sociology at Portland State University who had done extensive research in several American and European cities into skinhead hate organizations. ECF No. 26, Exh. 14, at 2885-86. Dr. Blazak was also the head of the Hate Crime Research Network at Portland State, a network of researchers and academics who study hate crimes. He was also the chairperson of the Oregon Coalition Against Hate Crimes, a

group made up of law enforcement personnel, civil rights groups, and other members of the public. *Id*. at 2886-88. In that capacity he had several interactions with Randall Krager, the founder and leader of the Portland-based Volksfront, and monitored some of Volksfront's activities. *Id*. at 2904-09, 2912.

Dr. Blazak testified on direct examination that "white supremacists" did not constitute an "identifiable group" because there was too much disagreement among the several different factions. *Id*. at 2891-2903. The two core principles that tie together all the different white supremacist groups are a general belief that whites are superior to members of other races and that the white race is currently under threat, but beyond that the groups are in great disagreement, even over such basic things as defining who is a "white" person. *Id*. There is no single umbrella organization or hierarchy within the white supremacy community. *Id*. at 2921. Dr. Blazak's opinion was that "white supremacy" did not constitute an identifiable group with a single, comprehensive ideology but rather was "a counterculture held together, barely, by this idea of racism and white supremacy . . . . [I]t's part of a continuum. So many of the beliefs are popular in mainstream society about race and homosexuality, for example, very popular in mainstream society. Those views aren't just the domain of white supremacists." *Id*. at 2922. Although Volksfront began as a prison-based skinhead group, the organization underwent several changes in 2001 and now promotes itself publicly as a nonviolent, European heritage organization. *Id*. at 2907-09. After the murder of Randall Townsend, Mr. Monschke's membership was revoked and Volksfront issued a statement distancing itself from Mr. Monschke and condemning his actions. *Id*. at 2914.

On cross-examination, Dr. Blazak agreed that, using the common definition of the word "group," white supremacists could be broadly defined as a "group" adhering to a common

ideology: that white people are superior and the white race is threatened. *Id*. at 2923-25. He also confirmed that Volksfront is a very secretive organization and conceded it was possible that the nonviolent message Volksfront publicly espouses is not necessarily genuine. *Id*. at 2929-30. "[T]here is a public face, and then there may be this world that even I haven't seen." *Id*. He agreed the group may have distanced itself from Mr. Monschke solely to avoid liability from civil lawsuits. *Id*.

In his personal restraint petition filed with the Washington Court of Appeals, Mr. Monschke argued that his defense counsel had rendered ineffective assistance of counsel by failing to adequately interview and prepare Dr. Blazak prior to his testimony. In support of his claim, Mr. Monschke submitted a declaration from Dr. Blazak and one of his former defense counsel, Erik Bauer (not from Jay Berneburg, the attorney who actually conducted the direct examination of Dr. Blazak). ECF No. 26, Exh. 27, attached Declaration of Eric Bauer; Exh. 30, App. B (Declaration of Dr. Randy Blazak). The Court of Appeals reviewed the new evidence in light of the trial record and concluded that Mr. Monschke had failed to demonstrate that counsel's performance was deficient:

> Monschke's trial attorneys made a strategic and tactical decision to call an expert witness to explain that white supremacists are not an identifiable group and that Volksfront was a nonviolent white supremacist group. Thus, Monschke's attorneys planned to "negate[] the prosecution's efforts to establish Mr. Monschke's membership and advancement as required by the [aggravating circumstance] statute." PRP Decl. of Eric L. Bauer (Dec. of Bauer) at 2-3. But, according to defense counsel, at trial, Blazak "presented opinions that he had not presented in pretrial interviews" and he "volunteered [the damaging information] without being prompted." Dec. of Bauer at 3. Even though this unexpected testimony allegedly "damaged the defense on every critical point," Monschke's counsel's performance does not rise to the level of ineffective assistance of counsel. Dec. of Bauer at 3.
>
> . . .

Bauer declares that Blazak volunteered information without prompting by questions during his testimony. In any attorney's experience, this behavior by a witness is problematic, making the person a difficult witness. But Monschke points to nothing that would have ensured that Blazak did not volunteer information on the stand, even if his counsel had done a mock trial or practiced Blazak's testimony, since Blazak volunteered his testimony without prompting, and Blazak declared he testified to nothing inconsistent with what he told Monschke's defense counsel before trial.

Monschke does not argue that defense counsel is held to a higher standard in preparing for an expert witness than the standard applicable to an alibi witness or any other indispensable witness. The record does not disclose the details of Monschke's trial counsel's pretrial interviews with Blazak, but we do know that they met with him more than once. From the record before us, Monschke's trial counsel's preparation of Blazak did not fall below the standard discussed in [*In re Stenson*, 142 Wn.2d 710, 16 P.3d 1 (2001)] or [*In re Pirtle*, 136 Wn.2d 467, 965 P.2d 593 (1998)]. Therefore, we hold that, because Monschke's counsel made a strategic tactical decision to call an expert to rebut the State's expert testimony, met with Blazak before trial, and then Blazak volunteered information from the witness stand, Monschke has not met his burden of establishing that trial counsel's performance was deficient based on inadequate expert witness preparation.

ECF No. 26, Exh. 31, at 13-14.

The Court of Appeals further ruled that Mr. Monschke had failed to demonstrate that Dr. Blazak's unexpected testimony prejudiced the defense, in light of the other evidence admitted at trial through such witnesses as Dr. Pitcavage, Tristain Frye, and Mr. Monschke himself:

First, Blazak provided both expected testimony that helped the defense as well as unexpected, damaging testimony. Throughout his testimony, Blazak remained consistent in putting forth his views that supported Monschke's position that "white supremac[ists]" were not an "identifiable group" because there is too much disagreement among the people who share the white supremacist ideology. 34 RP at 2891. Blazak also testified that Volksfront has a hierarchy in which members "gain status ... through hard work and dedication." 34 RP at 2920.

Additionally, he explained how a person might obtain notoriety among people who are white supremacists by murdering someone inferior, but he maintained that white supremac[ists] do not have a formal hierarchy or status structure. Blazak further testified that Volksfront may secretly promote violence,

but he also stated that, "having monitored [Volksfront,] we couldn't come up with any incidents of anybody who has been promoted because of any act of violence." 34 RP at 2914. Blazak also testified that Volksfront e-mailed Blazak, saying that they "condemn acts of violence and [Monschke's] membership ... had been terminated," that "the movement of Volksfront is to say these violent offenders are hurting [their] larger cause," that "newer members of the Volksfront are less violent," and that he believes Randall Craiger, the leader of Volksfront, "is sincere in his desire to take Volksfront into this new [nonviolent] territory of white supremacy." 34 RP at 2914, 2964, 2970, 2972.

It is unclear whether Monschke is arguing that his trial attorneys should have called another expert or no expert at all. But even without Blazak's testimony, there was sufficient evidence for a reasonable jury to have found the aggravating circumstance based on other trial testimony. For example, the State's expert witness testified that many white supremacist groups internally advocate violence but publicly profess nonviolence to avoid civil liability. *Monschke*, 133 Wn. App. at 327. Thus, the State had already offered testimony similar to Blazak's. Additionally, Monschke admitted his involvement in Volksfront. Frye's testimony about going out with Monschke, Butters, and Pillatos to earn her red shoelaces, which would mean increased notoriety among white supremacists, also supports the aggravating circumstance.

Because we hold that Monschke's counsel was not deficient and did not prejudice Monshke's right to a fair trial, his ineffective assistance of counsel claim fails.

ECF No. 26, Exh. 31, at 14-16.

In his ruling denying Mr. Monschke's motion for discretionary review, the

Commissioner of the Washington Supreme Court similarly concluded that Mr. Monschke had

failed to meet his burden under *Strickland*:

Calling Dr. Blazak as a defense witness was a reasonable trial tactic in light of his expertise on white supremacist groups. The likely alternative would have been to allow the State to put on its expert witness without opposition. Whether defense counsel should have spent more time preparing Dr. Blazak for potential prosecution questions may be debatable in light of events at trial, but even if counsel was deficient in this regard, Mr. Monschke fails to show prejudice; that is, a reasonable probability that, but for the alleged deficiency, the result would have been different. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 672-73, 101 P.3d 1 (2004). Even without Dr. Blazak's testimony, the jury likely would have found the aggravating factor based other evidence on the testimony of the State's expert; Mr. Monschke's admission of membership in

Volksfront; and the testimony of Tristain Frye (another participant in the murder who pleaded guilty to second degree murder), who stated that the killing was connected with promotions in the white supremacy hierarchy.

ECF No. 26, Exh. 39, at 2 (footnote omitted).

The Washington state appellate courts correctly noted that calling Dr. Blazak as a defense witness in light of his expertise on white supremacist groups to counter the State's expert witness was a reasonable trial tactic. The alternative would have been to allow the State to put on expert testimony with no rebuttal.

The Washington appellate courts also correctly noted that even without Dr. Blazak's testimony, the jury likely would have found the aggravating factor based other evidence – the jury had already heard from: (1) Mr. Monschke that he was a member of Volksfront; (2) the State's expert that Volksfront had a history of violence and that white supremacists are a finite subset of society who adhere to a common ideology; and (3) Tristain Frye that killing is connected with promotions in the white supremacy hierarchy.

The Washington appellate courts' rulings involved a reasonable application of the *Strickland* standard and the undersigned recommends that Claim 8 should be denied.

I.      **Claim 9 – Prosecutorial Misconduct – Using Frye as a State Witness**

In his ninth ground for federal habeas relief, Mr. Monschke alleges the prosecutor committed misconduct by encouraging Tristain Frye to commit perjury as a State's witness. Monschke contends that even though Frye equally participated in the crime, she was allowed to plead guilty to second-degree murder, rather than first-degree murder. He claims the prosecutors knew that Frye and David Pillatos were fabricating a story in order to exonerate and to create a defense for Pillatos, with the goal of getting plea bargains in exchange for their testimony. Mr. Monschke further contends that Frye was offered the favorable plea agreement

she ultimately received only because the elected prosecutor at that time, Gerald Horne, was a close personal friend of Frye's defense attorney. ECF No. 26, at 37-40; ECF No. 30, at 62-72.

The knowing presentation of false testimony or evidence against a defendant to obtain a conviction may constitute a violation of due process. *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S.Ct. 763 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 (1959). To prevail on a *Napue* claim, the petitioner must show "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony [or evidence] was actually false, and (3) the false testimony [or evidence] was material." *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)). False evidence is "material" under the *Napue* standard if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392 (1976)).

Tristain Frye testified as a State's witness at Mr. Monschke's trial. ECF No. 26, Exh. 10, at 2326-49; Exh. 31, at 2356-2496. She pled guilty, pursuant to a plea agreement, to murder in the second degree for her role in the death of Randall Townsend. *Id.*, Exh. 10, at 2327.[5] Mr. Monschke raised a claim in his personal restraint petition challenging the prosecutor's plea agreement with Frye. In support of that claim he submitted a declaration dated September 30, 2008, from a former Pierce County deputy prosecuting attorney who had

---

[5] Copies of Frye's written guilty plea statement and her plea agreement in *State v. Frye*, Pierce County Superior Court No. 03-1-01463-1, were provided to Mr. Monschke's defense counsel and are contained in the appendices to the State's response to Mr. Monschke's personal restraint petition. ECF No. 26, Exh. 28A, App. D (*State v. Frye*, Statement of Defendant on Plea of Guilty), and *id*. at App. E (*State v. Frye*, Plea Agreement). Frye received a 165-month prison sentence, which represents the low end of the standard sentencing range for second-degree murder. ECF No. 26, Exh. 28A, App. Q (*State v. Frye*, Judgment and Sentence).

REPORT AND RECOMMENDATION - 60

been involved the case before Frye, Butters, and Pillatos entered into their plea agreements. *Id.*, Exh. 27, attached Declaration of Barbara Corey.

Ms. Corey opined that (1) Frye and Pillatos were fabricating a story and attempting to perpetrate a fraud on the court and the prosecutor's office, (2) Pillatos and Frye's versions of events were suspect in light of their correspondence with each other, (3) Prosecutor Horne and the two deputy prosecutors who tried the case knew of Frye and Pillatos's plan to manipulate the trial, (4) she was personally opposed to giving Frye a reduced sentence, and (5) Frye received her favorable plea agreement because of a personal relationship between Horne and Frye's attorney. *Id.*

The State responded to Mr. Monschke's claim and submitted the affidavits of the two deputy prosecutors who executed the plea agreement with Frye. ECF No. 26, Exh. 28A (Appendices to State's Response), at App. M (Affidavit of Greg Greer), and *id.* at App. O (Affidavit of Gerald Costello). The prosecutors stated Ms. Corey had a great deal of animosity for Frye's defense counsel and her animosity affected her judgment regarding an assessment of Frye's culpability. The deputy prosecutors decided to enter into a plea agreement with Frye because she was the most credible and least culpable of the four co-defendants and she was the only one who expressed any remorse for the murder. Although she and Pillatos had corresponded with each other from jail (which correspondence was intercepted by jail officials), Frye had not attempted in any of her letters to manipulate Pillatos's testimony. "Ms. Frye's correspondence to Mr. Pillatos did not contain attempts to influence his testimony. Ms. Frye's correspondence indicated that she intended to tell the truth about what happened that

night." *Id.*, App. M at 6-7.[6]  The deputy prosecutors also asserted that Prosecutor Horne had

no role in the decision-making process with regard to Frye's plea agreement, and Horne's

friendship with Frye's attorney was not a factor in the decision to offer Frye a plea agreement.

*Id.*, App. M at 8; App. O at 2.

The Washington Court of Appeals concluded the prosecutors had shown a legitimate

purpose in offering a plea agreement to Frye and dismissed Mr. Monschke's allegation that the

prosecutors' entering into a plea agreement with Frye was improper.  ECF No. 26, Exh. 31, at

17-18.

> Here, Monschke, Frye, Butters, and Pillatos all testified at Monschke's
> trial.  And although their testimony differed about the sequence of events the
> night of the murder and Monschke's participation in the assault on Townsend, the
> defense had the opportunity to cross-examine and impeach all of Monschke's
> codefendants, particularly Frye and Pillatos, using the known content of their
> communications before they entered their pleas and before they testified.  On
> cross-examination, Monschke's counsel confronted Frye about only one letter she
> had written from jail, and it was one she had written to Monschke, not Pillatos.
>
> Our review of other jail correspondence Frye wrote shows that, although
> she wanted direction from Pillatos, she also demonstrated remorse and repeatedly
> discussed her intention to tell the truth and her desire for Pillatos to support her
> decision to testify truthfully.  It is likely that if the defense had attempted to
> impeach Frye with the letters she wrote Pillatos or others that the State would
> have responded by introducing the numerous letters wherein she wrote about
> telling the truth and wanting to take a polygraph examination.  Therefore, defense
> counsel likely made the tactical decision not to attempt to impeach Frye based on
> her communication with Pillatos because they knew the attempt would be
> unsuccessful and might open the door to evidence that would bolster her
> credibility with the jury.
>
> Furthermore, Monschke has not demonstrated that Frye committed
> perjury, as he failed to identify what portion of Frye's testimony constituted

---

[6] All of Frye's intercepted jailhouse correspondence - consisting of several hundred pages of letters - was turned over to Mr. Monschke's defense counsel as part of the pretrial discovery process.  ECF No. 26, Exh. 28A, App. P (Affidavit of Michelle Prichard); App. R (Affidavit of Kathleen Proctor, describing and categorizing Frye's correspondence); and App. S (Frye correspondence).  Neither Mr. Monschke nor his defense counsel ever disputed that the defense was in possession of all of Frye's letters.

perjury. He points only to the prosecutors' knowledge that Pillatos and Frye communicated about assisting each other, which knowledge the prosecutors shared with the court and defense when they discovered these communications, making all aware of their violation of the court's order. Monschke's prosecutorial misconduct claims fail.

ECF No. 26, Exh. 31, at 18-20 (footnote omitted). The Commissioner of the Washington Supreme Court concurred with the Court of Appeals' determination:

[Monschke's] assertions are speculative. I agree with the Court of Appeals that the State did not knowingly put on perjured testimony and that there is insufficient evidence that Ms. Frye perjured herself. Mr. Monschke thus fails to show either improper conduct or prejudice arising from misconduct.

ECF No. 26, Exh. 39, at 3 (citation omitted).

As noted by the Washington Court of Appeals, Mr. Monschke was given pretrial access to several hundred pages of letters between Frye and Pillatos. The defense also had ample opportunity to thoroughly cross-examine Frye concerning her plea agreement, her relationship and correspondence with Pillatos, and any other matters bearing on her potential bias. It was up to the jury to decide whether she was credible.

The Washington appellate courts' adjudication of Mr. Monschke's claim was neither contrary to, nor an unreasonable application of clearly established federal law for purposes of 28 U.S.C. § 2254(d). Therefore, the undersigned recommends that Claim 9 be denied.

## CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could

REPORT AND RECOMMENDATION - 63

disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard and based on a thorough review of the record and analysis of the law in this case, this Court concludes that Mr. Monschke is not entitled to a certificate of appealability with respect to this petition.

## CONCLUSION

Based on the foregoing discussion, the undersigned recommends that Mr. Monschke's habeas petition be **denied**. Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985).

Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **June 29, 2012**, as noted in the caption.

**DATED** this  11th  day of May, 2012.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 64